Argued and submitted February 27, vacated and remanded for further
proceedings December 30, 2009

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

REBECCA ANN MACHAIN,
*Defendant-Appellant.*

Douglas County Circuit Court
04CR1808FE; A134503

225 P3d 75

David O. Ferry, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.

Jeremy C. Rice, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Ortega, Judge, and Riggs, Senior Judge.

ORTEGA, J.

## ORTEGA, J.

Defendant appeals her murder conviction, ORS 163.115, assigning error to the denial of her motion to suppress statements she made during an interview with police officers. Although she was provided with *Miranda* warnings at the beginning of the interview, she contends that her waiver of her rights to remain silent and to have the assistance of counsel was not knowing and intelligent.

The trial court did not decide whether defendant's waiver was valid. Instead, it concluded that defendant was not in the sort of compelling circumstances that require *Miranda* warnings when she made the statements at issue, obviating the need to evaluate the validity of the waiver. The state contends that that conclusion was correct; defendant takes the opposite view. The parties agree that, if this court determines that defendant was in compelling circumstances during the interview, the case should be remanded to the trial court for findings on the validity of defendant's waiver. For the reasons set forth below, we conclude that defendant was in circumstances requiring *Miranda* warnings, and we therefore vacate and remand.

For context, we begin with some background information that the parties do not dispute. At the time of the murder, defendant was 15 years old and living with her sister and her sister's 14-year-old son, Troy Anderson, the victim. On the afternoon of September 30, 2004, the victim was found in the family home; he had been shot, and he died later that day. Things had been strewn around the home, and money was missing from a safe in defendant's sister's bedroom.

Some neighbors reported hearing loud music and a gunshot that afternoon; another neighbor reported seeing defendant and her friend Irwin walking away from the home in the afternoon, although not necessarily around the time of the shot. Detectives Wheaton and Batsch were assigned to contact defendant and Irwin to see if they had any useful information. Wheaton and Batsch interviewed defendant twice that day—once from 5:00 to 5:35 p.m. at the sheriff's office and once briefly later in the day at the police department. Wheaton provided *Miranda* warnings each time.

Defendant does not assign error to the admission of evidence obtained during those interviews.

The next day, October 1, defendant was again interviewed twice. The trial court granted defendant's motion to suppress evidence obtained during the final interview because Wheaton continued to question defendant after she made at least an equivocal invocation of her right to counsel. The court denied defendant's motion to suppress evidence obtained during the first October 1 interview. The court concluded that defendant was not in compelling circumstances and that *Miranda* warnings therefore were not required. On appeal, defendant contends that she was questioned under circumstances requiring *Miranda* warnings and that this case should be remanded for findings about whether she knowingly and intelligently waived the rights described in those warnings.

We turn to the evidence specific to the first October 1 interview. We state the facts consistently with the trial court's factual findings and, in regard to factual issues as to which it made no findings, its denial of defendant's motion to suppress. *State v. Shaff*, 343 Or 639, 641, 175 P3d 454 (2007). On the afternoon of October 1, Wheaton and Batsch picked up defendant at Irwin's house, where she had spent the night. The detectives asked defendant if she would accompany them to the sheriff's office for another interview, and she agreed to do so.

At the beginning of the interview, Wheaton again provided *Miranda* warnings, and defendant orally waived the relevant rights. Wheaton thought that defendant appeared tired; in fact, she told him as much early in the interview, which took about two and one-half hours, from about 1:35 p.m. to 4:15 p.m. Wheaton acknowledged that, during that interview, the tone of his questioning changed from being fatherly and friendly; he started feeling that defendant's story had discrepancies.

The interview took place in an interview room and was recorded on both videotape and audiotape. Initially, Wheaton and Batsch conducted the interview, with Wheaton asking most of the questions. Defendant asked Wheaton at one point how much longer the interview would take, to

which he replied, "Not too much longer." Wheaton and Batsch then left the room. After a break, during which defendant was left alone in the interview room, Wheaton reentered the room with a different detective, Borigo, and told defendant that "what we're gonna do is just gonna finish up with you. Sometimes it helps us if we get a fresh detective in here. Maybe she's got some questions that we're not asking." It is after this juncture, in defendant's view, that the circumstances became compelling.

Defendant again asked, "So, like how much longer do you think?" Wheaton told her that he did not know but did not think it would be too much longer; he added, "I don't want to sit there and tell you ten minutes and then it takes an hour, you know what I mean?" Defendant responded, "Yeah. I understand." Defendant did not, however, state that she wanted to leave, and Wheaton believed that she was willing to remain and talk.

Wheaton told defendant that "stuff ain't adding up," that there were inconsistencies between defendant's and Irwin's accounts, and that "you need to be a little bit more truthful with us and kinda give us some more." Wheaton and Borigo talked with defendant about polygraph testing, stating that they would probably give her one and that the tests were very accurate and asking if she would have problems passing a polygraph. Borigo stated that she had interviewed Irwin and that "I come listening on [Wheaton's] interview and I hear you lying to him. So, now it's time to tell the truth." Borigo told defendant that a polygrapher was on his way and the DA's office had called the polygrapher "because they know you lied." Defendant then answered questions concerning sensitive topics not directly related to the shooting.[1]

After some questions about the safe in defendant's sister's bedroom, Wheaton reminded defendant that she had been fingerprinted and asked her whether her fingerprints would be on the safe. Defendant then admitted trying to get into the safe to see what was in it. After some other questions

---

[1] Borigo questioned defendant about sexual contact between defendant and her female friend Irwin. Borigo told defendant not to lie and not to call her best friend a liar. They also discussed defendant's sexual activity with her boyfriend, her relationship with her mother, and a suicide attempt a year earlier.

about the condition of the house, the following exchange occurred:

"Wheaton: I'm gonna come right out and ask you. Did, did you try to get in that safe yesterday?

"[Defendant]: Not yesterday.

"Wheaton: Are you sure?

"[Defendant]: Mm, hmm (indicates affirmative).

"Wheaton: And we'll be able to prove that.

"[Defendant]: M'kay.

"Wheaton: That's why I . . . I want to giving you the benefit of the doubt.

"[Defendant]: M'kay.

"Wheaton: I'm not as . . . saying you're involved in anything else. I am strictly asking you if you tried to get in that safe yesterday?

"[Defendant]: No.

"Wheaton: Be honest.

"[Defendant]: I'm pretty sure maybe the day before I tried.

"Wheaton: Okay. Now, pretty sure isn't a good answer.

"[Defendant]: Okay. Yeah. I did it like the day before, so . . .

"Wheaton: Are you sure it wasn't yesterday?

"[Defendant]: ‹Inaudible›.

"Borigo: They're processing the prints right now, Jeff.

"Wheaton: Okay.

"Borigo: We'll know momentarily.

"[Defendant]: I'm pretty sure it wasn't yesterday. It could have been. Wait, let me think . . . what did I do yesterday . . .

"Borigo: I'm vibrating, just a sec. I'll be right back. That could be them, Jeff.

"Wheaton: Okay.

"[Defendant]: Let's see . . . okay, yeah, yesterday."

Defendant began describing her efforts to get into the safe. Wheaton and Borigo told defendant that they were not investigating a theft and that she needed to be honest about the safe. Wheaton told defendant that he thought that she had stolen the money from the safe and then ransacked the house to make it look like someone had broken in. Defendant responded, "But, why would I do something like that to [the victim]?" Both Wheaton and Borigo responded that they were not talking about the victim and that the house was a separate incident. Defendant then admitted that she took money from the safe.[2] Wheaton suggested that defendant "probably [felt] pretty good about getting that off [her] chest."

After the discussion of the safe, Wheaton and Borigo told defendant that the Oregon State Police Crime Lab was processing the scene and would be able to figure out "everything." Wheaton suggested to defendant that "there's circumstances for everything." The following discussion ensued:

"Wheaton:    And that's why we're talking about [the victim]. There's a reason what happened there. Don't know the facts yet, because you[3] haven't came out and told us yet. But there's a reason. There's accidents. There's self defenses. There's a reason people do this. So . . .

"Borigo:    You didn't want this to happen, did you? It was the crime lab again. [Defendant], look me in the eye.

"Wheaton:    What was the reason you shot him?

"Borigo:    You didn't mean it to happen and I believe that with all of my heart. They're picking [Irwin] back up again. Okay?

"[Defendant]:    'Kay.

"Wheaton:    Why did you do it?

_____

[2] Borigo asked defendant about whether she and Irwin planned to leave town; Borigo told defendant to "remember, I spent a long time with [Irwin] and she talked to me quite a bit," and told defendant to show Irwin love and respect by being honest.

[3] The word "you" does not appear in the transcript of the interview submitted as an exhibit, but it is audible on the videotape.

> "Borigo:   I'm gonna give you the opportunity now to tell what happened. Because we know what happened now. My last phone call. You need to be honest now.
>
> "[Defendant]:   'Kay.
>
> "Wheaton:   Why . . .
>
> "Borigo:   You need to be honest.
>
> "Wheaton:   There's a reason. Why did you do it?"

Several times, as defendant began to talk about the shooting, Borigo and Wheaton directed her to look at them. Defendant, who was crying during this portion of the interview, stated that another person, Curtis, had shot the victim. She attributed Curtis's alleged actions to his concern that the victim knew that defendant and Irwin had stolen money, a portion of which had gone to Curtis. Although she denied shooting the victim, defendant eventually acknowledged that she was present when he was shot. Wheaton told defendant that the polygrapher would know if she was lying when she denied shooting the victim, and Borigo suggested that ballistics and an autopsy would match.

The trial court concluded that, under the totality of the circumstances, defendant was not in compelling circumstances during that interview. In a letter opinion, the court stated that, "[a]lthough the interview did become somewhat more confrontational during the period in question, [defendant] was free to terminate the questioning at any time, and there is nothing about the length of the process that is significant." The court did not, therefore, reach the issue of the validity of defendant's waiver of her rights.

■     Defendant contends that the circumstances of the interview were compelling. She emphasizes that she had been given a ride to the police station by officers and was reliant on them for transportation, that the interview occurred at the police station, that she was not told that she was free to leave, and that the questions became increasingly accusatory, as officers told defendant that "CSI and stuff" would reveal everything.

The state, in turn, emphasizes that, although defendant was told that she did not have to talk with the officers if she did not want to, she never attempted to end the interview and the officers did not limit her ability to do so; that the interview was about two and one-half hours long; and that defendant's ability to leave was not restricted. In the state's view, although defendant was asked questions that assumed her guilt, such questioning, by itself, is insufficient to create compelling circumstances.

We reject the view that the guilt-assuming questions were the only factor weighing toward compelling circumstances. We conclude that defendant was in a situation that required *Miranda* warnings and that, as a result, we must vacate and remand to the trial court to determine whether defendant validly waived her rights.

■■■ Article I, section 12, of the Oregon Constitution provides, "No person shall * * * be compelled in any criminal prosecution to testify against himself." To protect that right, "before questioning, police must give *Miranda* warnings to a person who is in full custody or in circumstances that create a setting which judges would and officers should recognize to be compelling." *State v. Roble-Baker*, 340 Or 631, 638, 136 P3d 22 (2006) (citations and internal quotation marks omitted). Whether the circumstances at issue were compelling depends on how a reasonable person in the position of the person being questioned would have understood his or her situation. *Shaff*, 343 Or at 645. In determining whether an encounter between police officers and a defendant evolved into a compelling setting, the court considers these nonexclusive factors:

> "(1) the location of the encounter; (2) the length of the encounter; (3) the amount of pressure exerted on the defendant; and (4) the defendant's ability to terminate the encounter.

> "Those factors are neither the exclusive factors that this court will consider, nor are they to be applied mechanically. Rather, in determining whether the police placed a defendant in compelling circumstances, this court will consider all the circumstances, and its overarching inquiry is whether the officers created the sort of police-dominated

atmosphere that *Miranda* warnings were intended to counteract."

*Roble-Baker*, 340 Or at 640-41 (citations omitted).

In *Roble-Baker*, the defendant was found to be in compelling circumstances. She was questioned at police headquarters for five to six hours, and detectives did not honor her two requests to end the interview. Rather, detectives had created a situation in which the defendant was essentially required to remain at police headquarters to await the arrival of her minor child. When the defendant left the interview room and went out to a smoking area, detectives followed her outside and then asked her questions that assumed her guilt. *Id.* at 642-43.

*Shaff*, on the other hand, illustrates circumstances that were not compelling. There, two police officers went to the defendant's home in response to a report that a woman in the home was injured. One officer spoke with the defendant, who, at the end of the conversation, admitted that he and the woman had had a fight and that he had hit her. 343 Or at 641-43. Although the officer falsely suggested to the defendant that the woman had reported an assault, the court emphasized that

> "what matters is not whether evidence of guilt was apparent to the suspect; rather, it is whether the officers used that evidence in a coercive manner. In this case, [the officer] raised the issue whether the argument had become physical only twice during his approximately 10-minute conversation with defendant. The first time, the officer did not pursue the point after defendant's denial. The second time the officer raised the issue, he did so only after seeing, and noting, the woman's obvious injuries. The officer's questions were not coercive, aggressive, or repetitive. Indeed, the last question that the officer asked was sympathetic. Given the location of the encounter, the brief time that it lasted, and the absence of any 'heightened level of activity' by the officers, evidence that an assault had occurred (whether apparent to defendant or reflected in the officer's questions) is not sufficient to say that the officers had placed defendant in compelling circumstances that required *Miranda* warnings under the Oregon Constitution."

343 Or at 650-51; *see also State v. Saunders*, 221 Or App 116, 120, 188 P3d 449, *rev den*, 345 Or 416 (2008) (concluding that confronting the defendant with incriminating evidence, without using the evidence coercively, did not create compelling circumstances).

Here, defendant was interviewed at the sheriff's office for about two and one-half hours. Although the length of the interview was less than the five- or six-hour interview in *Roble-Baker*, it was substantially longer than the 10-minute interview at issue in *Shaff*. The interview was defendant's third in less than 24 hours. Defendant appeared tired and, early in the interview, stated that she felt tired.

The pressure exerted on defendant escalated during the interview and grew to a significant level by the time that officers began asking questions specifically about the shooting. After being told that her account of events was inconsistent with Irwin's and that the story was not adding up, defendant was told that she would be given a polygraph and that a polygrapher had been called in already "because they know you lied." She then answered questions that delved into extremely personal, sensitive topics. After she denied opening her sister's safe, she was told that detectives would be able to prove whether she had tried to get into the safe on the day of the murder and that the fingerprints on the safe were being processed during the interview. When Borigo announced that she might be about to receive more information from the crime lab, defendant admitted that she had tried to get into the safe.

The detectives then turned to questions directly relating to the shooting. Those questions assumed defendant's guilt and were interspersed with statements that the detectives were, during the interview, receiving more information and either knew or soon would know "everything." The detectives also repeatedly directed defendant to look at them and to tell the truth.

Unlike *Shaff* and *Saunders*, where officers confronted the defendants with evidence of guilt briefly and noncoercively, the detectives here repeatedly told defendant that they would be able to disprove any falsehood, that they knew that she was lying, and that she needed to tell the truth and

"be honest now." The detectives, who had told defendant that they would be able to figure out "everything" and that "we know what happened now," repeatedly asked questions that assumed defendant's guilt. Under the circumstances, a reasonable person in defendant's position would have understood herself to be compelled to answer the detectives' questions during the interview. In short, the detectives "created the sort of police-dominated atmosphere that *Miranda* warnings were intended to counteract." *Roble-Baker*, 340 Or at 641.

Accordingly, we reverse and remand for the trial court to determine in the first instance whether defendant knowingly and intelligently waived her rights. If the court finds that defendant validly waived her rights, the court should reinstate defendant's conviction. If the court determines that defendant's waiver was invalid, however, the statements made during the first October 1 interview should be suppressed.

Vacated and remanded for further proceedings.