Argued and submitted August 13, reversed and remanded October 30, 2013

In the Matter of D. P.,
a Youth.

STATE OF OREGON,
*Respondent,*

*v.*

D. P.,
*Appellant.*

Multnomah County Circuit Court
2010814711;
Petition Number 101104019;
A148957

313 P3d 306

Christa Obold-Eshleman argued the cause and filed the brief for appellant.

Anna M. Joyce, Solicitor General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Justice J. Rillera, Assistant Attorney General.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

EGAN, J.

**EGAN, J.**

Youth appeals a juvenile court delinquency judgment in which he entered a conditional admission to conduct that, if committed by an adult, would constitute second-degree rape, assigning error to the trial court's denial of his motion to suppress evidence of statements he made to police in the course of an interview.[1] He argues that the circumstances of the interview were custodial or compelling, thus requiring that the evidence be suppressed. We agree with youth and, accordingly, reverse and remand.

We review the denial of a motion to suppress for errors of law. *State v. Hall*, 339 Or 7, 10, 115 P3d 908 (2005). We defer to the trial court's factual findings if there is evidence in the record to support those findings. *Id.* If the trial court did not make express factual findings, we presume that the trial court found the facts in a manner consistent with its ultimate conclusion. *Id.*

This case involves charges that youth, a 12-year-old, committed acts which, if done by an adult, would constitute rape in the first degree and sodomy in the first degree. In the process of investigating a report that youth allegedly had sexual intercourse and oral sex with a 10-year-old girl, Detectives Smith and Grose went to youth's school to interview youth as a suspect. Youth, a sixth grader, attended an alternative middle school. After inquiring about youth from school staff members, the detectives learned that youth attended that school in part due to past behavioral problems. Youth was escorted to the school's office by the principal and led into a room in the administrative area of the school.

The interview began at 9:18 a.m. Youth was seated at a table nearest to the door, with his back facing the door, which was closed. Detectives Smith and Grose sat at the table opposite youth. The detectives told youth that he was free to leave if he wanted, and youth acknowledged that he understood. The detectives asked youth if they could record the conversation and youth declined. Youth was not informed that he was being interviewed as a suspect.

---

[1] Youth reserved his right to appeal the trial court's denial of his motion to suppress.

The detectives kept their voices down, asked youth specific questions using plain and simple language, tried to avoid asking leading questions, and gave youth time to think and answer each question. The detectives wore plain clothes, did not display their badges or firearms, and shook hands with youth when he entered the room. The detectives did not call youth's parents prior to the interview.

At the beginning of the interview, the detectives explained to youth that he was not going to be arrested that day. The detectives began discussing the difference between truth and lies, to ensure that youth understood what they said and why the interview was being conducted.

Early on, youth denied any wrongdoing, stating that he and the victim had a boyfriend/girlfriend relationship and that they had kissed a few times. As the interview progressed, Detective Smith explained to youth that a CARES[2] evaluation had been performed on the victim, and a sexual assault kit had been prepared. The detective explained DNA to youth in relatively simple terms, noting that DNA can transfer from one person to another through physical contact and on clothing. The detective explained that DNA would be evidence, and if youth's DNA was present "it could have shown up" in the rape kit. Following that explanation, Smith asked youth to tell them what had happened. Youth then told the detectives that he and the victim were playing together and listening to music.

Smith told youth that if he did not tell the detectives what had happened he would have to write a report, and that the "person who was deciding what would happen next, would have to make assumptions[.]" Youth thought for a moment and then asked if he would get a reward if he told the truth; the detectives responded in the negative.

Youth then gave the detectives more information but continued to deny having intercourse with the victim. Youth told the detectives that he and the victim had been playing in his garage making a club house. The victim wanted to go home, and youth suggested they go to her house to play. After arriving at the victim's house, they went into the

---

[2] CARES is a regional center that conducts child abuse assessments.

victim's room, and the victim closed the door. Smith again asked youth what had happened, and youth stated that he put his hand on the victim's knee, and the victim put her hand on his neck, but he moved away. Youth continued to deny having sex with the victim.

Smith asked if youth's zipper or pants had been down, and if youth or the victim had taken off their clothes. Youth denied that either he or the victim had removed clothing, and continued to deny that either he or the victim had touched each other's "privates," that he had put his penis in the victim's vagina, and that he and the victim had engaged in oral sex.

The detectives then turned the interview to a discussion of normal sexual curiosity of pre-adolescents, explaining that such curiosity is common. In response to the detectives' questioning, youth again denied any wrongdoing. The detectives told youth that he would have to tell his parents what happened and offered to tell youth's parents for him or allow youth to tell his parents. Youth was afraid and very concerned about his parents' reactions. Smith responded that youth's parents had to know the truth.

The detectives then returned to the topic of DNA, telling youth that they "just want[ed] to know what happened." Smith told youth that the victim "needed an explanation." Smith then stood up and put on blue plastic gloves while asking youth if he would consent to an oral swab to collect DNA evidence. Grose reiterated that they just wanted to know what happened. Youth did not answer the request for the oral swab. Youth became somber and began making concerned comments regarding whether he would get in trouble and commented that he was worried about telling his parents. Grose told him that, if he were 17 years old, "he would be going to prison. Since [he was] 12, it would be handled differently." Smith told youth, "You can decide to tell the truth or not tell us what happened." The detectives reiterated that youth's parents had to be told the truth.

Youth repeated several more times that he was afraid of his parents' reactions. At that time, Smith asked youth how long youth's penis had been in the victim's vagina. Youth answered, "[F]ive seconds." Detective Smith

then asked who had pulled down the victim's pants. Youth responded that the victim had "pulled her own pants down" and removed her underwear, and that he had pulled his pants down. After prompting youth to "tell * * * the whole story," youth stated that he and the victim went into the victim's bedroom and she closed and locked the door. After each had pulled down their own pants, they rubbed each other on the chest and the victim laid down. Youth stated that he laid on top of her, putting his penis in her vagina for two to three seconds. The victim later performed oral sex on youth. Youth stated that he had not threatened the victim to get her to engage in oral sex. The victim's mother knocked on the door and the victim pulled her pants up. Youth started to pull his pants up. At that point, the victim's mother entered the room, asked to speak with the victim, and told youth to go home.

Youth then asked the detectives to help him tell his mother about the incident, but stated that he did not want to tell his father because he was afraid. The interview concluded at 10:58 a.m.

At the hearing on the motion to suppress, Smith was the primary witness to testify about the interview. Smith stated that he intended to interview youth as a suspect. Smith described youth as having a "flat affect," noting that youth was not visibly shaking or sweating during the interview. Smith further testified that

> "from the minute that he made that decision about not to record [the interview], he was trying to be in charge of the interview. * * *[H]e was deliberately thinking about how much he wanted to tell us. * * * [I]t was like a negotiation, and he was enjoying it.
>
> "* * * * *
>
> "[M]y impression was he was consciously determining how much he was going to say."

Although denying that youth acted as if he was frightened or fearful during the interview, Smith stated that youth became "somber" and appeared to be concerned when the detectives discussed with youth the need to tell his parents. Smith testified that the detectives chose to

interview youth at school, in part, so that youth's parents would not interrupt the interview. Smith explained that he did not want to scare youth, and Grose stated that he did not feel *Miranda* warnings were necessary because "he was very comfortable with the conversation."

Both detectives testified that youth's facial expressions and demeanor indicated that he was not frightened during the interview. Both detectives testified that youth did not ask to have a parent, teacher, or other adult present during the interview; however, neither detective offered youth the opportunity to have another adult in the room during the interview. Both detectives testified that *Miranda* warnings were unnecessary, because the interview was not custodial.[3]

The juvenile court determined that the interview was not custodial, that the confession was not coerced, and that youth had made the statements knowingly, intelligently, and voluntarily. The court then denied the motion to suppress. Subsequently, youth entered the stipulated conditional admission, while reserving his right to appeal the denial of the motion to suppress, and the juvenile court found the youth to be within the court's jurisdiction.

On appeal, youth argues that the juvenile court erred in denying his motion to suppress his statements, because the detectives failed to give youth *Miranda* warnings

---

[3] Additional testimony was presented by a psychologist and youth's juvenile counselor. Dr. Bolstad, a psychologist who evaluated youth, testified that youth had a very negative view of the government and legal system, and was anxious, agitated, nervous, and would become angry because he believed that he was going to be tricked if questions were asked more than once. Dr. Bolstad testified that youth felt like he needed to help the police, because they "needed to hear both sides," and thus did not comprehend the notion of self-incrimination. Dr. Bolstad testified that one hour and forty minutes was a long time for a 12-year-old to be in an interview and noted that the detectives repeatedly asked youth the same questions. He further testified that youth was emotionally immature, estimating that youth functioned at the level of an eight-year-old, and that—during his evaluation of youth—even when youth exhibited anxiety, he did not leave and continued to answer questions.

Youth's juvenile counselor testified that youth was emotionally and socially immature, tended to be argumentative, and required concrete and succinct responses to questions so that he would understand the answer. He noted that youth would often try to continually renegotiate a point to obtain a different outcome.

and the interview (1) was a "compelling circumstance" for purposes of Article I, section 12, of the Oregon Constitution[4] when the interview began, or, in the alternative, at the point when the detective asked to swab his mouth for DNA, or (2) was a "custodial interrogation" for purposes of Article I, section 12, and the Fifth Amendment to the United States Constitution.[5] The state responds that that the trial court ruled correctly because youth was not in formal custody, nor were the circumstances such that a reasonable person in youth's position would have found the interview compelling.

We begin our analysis with youth's state constitutional arguments. *See Sterling v. Cupp*, 290 Or 611, 614, 625 P2d 123 (1981) (court addresses state constitutional issues before reaching federal constitutional issues).

The Oregon Constitution requires that police give a defendant *Miranda* warnings if the defendant is in "full custody" or in settings that "judges would and officers should recognize to be 'compelling.'" *State v. Jarnagin*, 351 Or 703, 713, 277 P3d 535 (2012) (quoting *State v. Smith*, 310 Or 1, 7, 791 P2d 836 (1990)).

We must consider all the circumstances to determine whether the officers created "the sort of police-dominated atmosphere that *Miranda* warnings were intended to counteract." *State v. Roble-Baker*, 340 Or 631, 641, 136 P2d 22 (2006). Several factors figure in this analysis, including "(1) the location of the encounter; (2) the length of the encounter; (3) the amount of pressure exerted on the defendant; and (4) the defendant's ability to terminate the encounter[.]" *Roble-Baker*, 340 Or at 640-41 (internal citations and parentheses omitted). The totality of the circumstances also includes "the nature of the questions." *State v. Dunlap*, 215 Or App 46, 57, 168 P3d 295 (2007).

In *Roble-Baker*, the Oregon Supreme Court concluded that the circumstances of the interview were compelling because the defendant had been questioned for five

---

[4] Article I, section 12, of the Oregon Constitution provides, in part, that "[n]o person shall be * * * compelled in any criminal prosecution to testify against himself."

[5] The Fifth Amendment provides, in relevant part, that "[n]o person * * * shall be compelled in any criminal case to be a witness against himself."

to six hours, during which time the detectives did not honor the defendant's two requests to end the interview, asked her questions that presumed her guilt, and followed her outside when she left the interview room. The defendant also had to wait at the police station for her minor child, and thus functionally could not leave. 340 Or at 642-43.

In contrast, the Oregon Supreme Court determined that the circumstances of the interview were not compelling in *State v. Shaff*, 343 Or 639, 641, 175 P3d 454 (2007). In *Shaff*, police officers responded to a report that a woman in the defendant's home had been injured. One police officer spoke with the defendant for approximately 10 minutes, falsely suggesting to the defendant that the injured woman had reported an assault. At the end of the 10-minute conversation, the defendant confessed to assaulting the woman. The court noted that if evidence of guilt is used in a coercive, aggressive, or repetitive manner, it could bear on whether the totality of the circumstances were compelling. 343 Or at 641-43, 650-51.

In *State v. Machain*, 233 Or App 65, 225 P3d 75 (2009), we focused specifically on whether the nature of the police officer's questioning resulted in compelling circumstances. In *Machain*, the defendant was interviewed for approximately two-and-a-half hours. We noted that the interview was shorter than the interview in *Roble-Baker*, and substantially longer than the interview in *Shaff*. *Machain*, 233 Or App at 75. The officers escalated the pressure exerted on the defendant, calling her answers to their questions "inconsistent," continually instructing the defendant to tell the truth, and telling the defendant that they had called for a polygraph examiner "because they kn[e]w [she had] lied." *Id.* The officers repeatedly told the defendant that the crime lab would provide the answers they were seeking. Additionally, their questions—which assumed the defendant's guilt—were interspersed with statements that the officers would soon "know 'everything.'" *Id.* We concluded that the circumstances in *Machain* were "compelling" because the detectives had created a police-dominated atmosphere. To make that determination, we considered the amount of pressure exerted on the defendant, whether the officers increased the amount of pressure during the

interview, the manner in which the officers used evidence of the defendant's guilt in their questioning, the nature of the questions, the use of repetitive questions, and the length of the interview. *Id.*

When a youth is involved, the determination that circumstances are compelling depends on "whether a reasonable person in child's position—that is, a child of similar age, knowledge and experience, placed in a similar environment—would have felt required to stay and answer all of" the detective's questions. *State ex rel Juv. Dept. v. Loredo*, 125 Or App 390, 394, 865 P2d 1312 (1993).

In *Loredo*, the police officer went to a 13-year-old's school to conduct an interview. The youth was summoned over the school's intercom system to the principal's office, where the officer and the youth were left alone with the door closed. The officer was dressed in plain clothes, his gun was not in view, and he introduced himself as an officer. The officer told the youth that he could leave if he desired, that he was not under arrest, and that he was not obligated to speak with the officer. The interview lasted 20 minutes and was interrupted when the youth was allowed to leave the room to call his counselor. *Id.* at 392-93.

In affirming the juvenile court's conclusion that the circumstances of the interview were not compelling, we observed that the officer had told the youth that he was not under arrest, that the youth did not have to talk to the police officer, and that the youth knew that he could leave if he wanted. *Id.* at 394. We also noted that the youth was in familiar surroundings, that the officer was not in uniform and was not displaying his gun, and that no additional authority figures were present during the interview. *Id.* Although we recognized that the interview was the first time that the youth had spoken with a police officer, the youth had testified that he was familiar with visiting the principal's office and that he was not obligated to stay and talk to whomever had summoned him. *Id.* at 393-94. However, we emphasized that police interviews in a school setting, which is a "constraining" environment, must be "conducted with due appreciation of the age and sophistication of the particular child. An interview that would not be 'compelling' for an

adult might nonetheless frighten a child into believing that he or she was required to answer an officer's questions." *Id.* at 395.

As noted, pursuant to Article I, section 12, of the Oregon Constitution, if an officer fails to give the requisite *Miranda* warnings to a person who is in "full custody" or in "compelling" circumstances, we must suppress the statements made in direct response to unwarned questioning. *Jarnagin*, 351 Or at 713.

In view of the foregoing, we now turn to the task of determining whether the circumstances in this case were "compelling." Here, the detectives initially made a concerted effort to be unimposing in both dress and demeanor, and attempted to keep the interview "low key" so that they would not scare or intimidate youth. The detectives shook hands with youth when he entered, kept their voices down, asked specific questions, avoided leading questions, used simple language, and gave youth time to answer each question. Neither detective wore a uniform or displayed his badge or firearm. At the beginning of the interview, the detectives explicitly told youth that he was free to leave, and that he was not required to answer questions. Youth affirmed that he understood those things. The detectives also explained to youth that they were not going to arrest him that day no matter what happened during the interview. The detectives requested youth's permission to record the interview, youth declined, and the detectives complied with youth's directive.

On the other hand, the detectives deliberately chose an interview location—an office at youth's school—in part, so that youth's parents would not interrupt the interview. Youth did not come to the interview room of his own volition; instead, he was summoned by the school's principal, removed from class, and escorted into the interview room, where he was then left alone with two police detectives. He was seated with his back facing the closed door, so that he could not see the exit. The detectives did not call youth's parents before the interview. Youth did not have anyone familiar in the interview room with him, such as a parent, counselor, or teacher. The detectives did not tell youth that any of those people could be present. The detectives did not inform

youth that he had a right to refuse the request for the DNA swab. The interview lasted for one hour and forty minutes. Further, although youth had consistently denied any sexual contact and any wrongdoing, throughout the interview the detectives revisited topics and questions in an effort to elicit different answers from youth. The detectives spoke about DNA, DNA transfer, and the sexual assault kit multiple times; they reiterated that if youth did not tell them the truth, then "the decisionmaker would have to make assumptions." Throughout the entire interview, the detectives repeatedly renewed their directive that youth had to tell his parents "the truth," despite youth's statements that he feared doing so and that he had not done anything wrong.

The detectives' initial inquiries were to find out "what happened"; later, the detectives said that youth could decide "to tell the truth or not tell us what happen[ed]." In contrast to the "low key" approach employed at the outset, by the end of the interview the questions were pointed and presumed youth's guilt—*e.g.*, asking "how long [youth's] penis had been in [the victim]'s vagina." The detectives told youth that the victim needed an explanation, and repeated multiple times—all while youth continued to deny any wrongdoing—that, if youth had been older, he would be going to prison. Instead, they explained that since he was only 12 years old, it would be handled "differently"—but they did not to explain what consequences he might actually face. Finally, near the end of the interview, Smith stood up, donned blue plastic gloves, opened the DNA testing kit, and asked youth to consent to a DNA swab—after repeatedly explaining to youth how DNA can transfer from person to person and without informing youth that he could withhold consent.

Although the detectives were unaware of the extent of youth's prior behavioral problems—such as youth's propensity to be argumentative; youth's marked emotional, social, and intellectual immaturity; or youth's need for concrete and succinct answers to questions—they were aware of youth's age, his prior behavioral issues, his need for an unconventional schooling environment to address his behavioral problems, and the conditions surrounding the allegations against youth. Thus, at a minimum, the detectives

should have known from the circumstances that youth was in a category of children that require a heightened level of precautions to ensure that he understood that he was not required to stay or answer the detectives' questions. *See Loredo*, 125 Or App at 395.

Here, taking into account the length of the interview, the location, youth's age, maturity level, the repetitive and escalating nature of the questions throughout the interview, and the increasingly coercive tactics used by the detectives, we conclude that a reasonable twelve-year-old of similar age, knowledge and experience, placed in youth's situation, would have felt required to stay and answer all of the detective's questions. *Id.*

In sum, we hold that, given the totality of the circumstances and in view of youth's age and experience—or lack thereof—the setting in which the interview took place was "compelling." Thus, *Miranda* warnings were required. The juvenile court erred in denying youth's motion to suppress.[6] *Jarnagin*, 351 Or at 713.

Reversed and remanded.

---

[6] Our determination that the circumstances were compelling obviates the need to determine if the interview was a "custodial interrogation" for purposes of the Fifth Amendment to the United States Constitution. *See Miranda v. Arizona*, 384 US 436, 444, 86 S Ct 1602, 16 L Ed 2d 694 (1966).