Submitted August 20, 2021, affirmed September 28, 2022

In the Matter of N. J. D. A.,
a Youth.

STATE OF OREGON,
*Respondent,*

*v.*

N. J. D. A.,
*Appellant.*

Yamhill County Circuit Court
18JU05100; A171701

519 P3d 125

After youth started a fire that killed his father, youth was adjudicated for acts that, if committed by an adult, would constitute murder, first-degree arson, and first-degree aggravated theft. On appeal, youth challenges the juvenile court's denial of youth's motion to suppress statements that youth made to a law enforcement officer the day after the fire. The statements were made in response to the officer questioning youth in his friend's yard, with youth's mother present, at a time when youth was not a suspect. The encounter lasted no more than 10 minutes. Youth argues that the officer interrogated him in compelling circumstances without *Miranda* warnings, in violation of Article I, section 12, of the Oregon Constitution. *Held*: The juvenile court did not err by denying youth's motion to suppress. Based on the totality of the circumstances—including the location of the encounter, its length, the amount of pressure exerted on the youth, and the youth's ability to terminate the encounter—the circumstances were not "compelling" so as to compel youth to testify against himself, and *Miranda* warnings therefore were not required.

Affirmed.

Cynthia L. Easterday, Judge.

Christa Obold Eshleman filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Christopher Page, Assistant Attorney General, filed the brief for respondent.

Before Tookey, Presiding Judge, and James, Judge, and Aoyagi, Judge.

AOYAGI, J.

Affirmed.

**AOYAGI, J.**

Youth was adjudicated for acts that, if committed by an adult, would constitute two counts of murder, ORS 163.115, two counts of first-degree arson, ORS 164.325, and one count of first-degree aggravated theft, ORS 164.057. Before trial, youth moved to suppress statements that he made to a law enforcement officer shortly after the crimes, arguing that the officer questioned him in compelling circumstances and failed to give him *Miranda* warnings before doing so, in violation of Article I, section 12, of the Oregon Constitution. The sole issue before us on appeal is whether the juvenile court erred in denying suppression. We conclude that it did not and therefore affirm.

## FACTS

We review the denial of a motion to suppress for errors of law. *State v. D. P.*, 259 Or App 252, 254, 313 P3d 306 (2013). We defer to the juvenile court's factual findings if there is evidence in the record to support them. *Id.* Where the juvenile court did not make express findings, we presume that it found the facts in a manner consistent with its ultimate conclusion. *Id.* We state the facts accordingly.

Youth, aged 14, lived with his parents in Willamina.[1] Late on the night of June 12, 2018, or in the early hours of June 13, 2018, more than $10,000 was removed from youth's parents' safe, and the house was set on fire. Youth's father died in the fire.

Youth's mother did not know initially whether youth had escaped the fire. She and law enforcement searched for him at the home but did not find him. Around noon on the day after the fire, youth's mother returned to the home after receiving medical treatment for her injuries, and she told Sergeant Whitlow that she knew where youth was: J's house. J was someone with whom youth spent a lot of time, and youth was very familiar with J's family and felt comfortable at J's house. Whitlow and youth's mother drove together to J's house in Whitlow's patrol vehicle. It was approximately a mile from youth's home. When they arrived, they followed a

---

[1] Youth was adopted by his biological grandmother and her husband. We use their adoptive titles—mother, father, and parents.

sign on the front door directing visitors to use the back door. They knocked on the back door, and J answered it. Youth's mother asked if youth was there. J stepped away from the door, and youth came outside, without any verbal directives from Whitlow.

Youth told his mother that he did not want to talk to the police. His mother replied that they were going to question everybody. Whitlow did not hear that exchange.

Youth and Whitlow stepped to the side of the house for privacy to talk, "probably" at Whitlow's request, because there were "quite a few folks" in the house. Whitlow was dressed in uniform and had a firearm in his holster. No other officers were present, and Whitlow did not consider youth a suspect at the time. Youth's mother remained present and within earshot for the entire conversation,[2] and she was attentive to youth while he talked to Whitlow. Youth and Whitlow stood a "couple of feet" apart (what Whitlow described as a "casual distance"). They maintained a consistent distance throughout the conversation. Whitlow did not direct youth to stand against a wall or a tree. Youth was not arrested, handcuffed, or detained. Whitlow never touched youth. Whitlow did not perceive any indication that youth was reluctant to speak to him, or that youth was in any kind of physical, emotional, or mental discomfort. Whitlow does not recall youth ever saying that he was scared or nervous, although Whitlow assumed that he probably was, as that would be "natural" for someone who had "been through a traumatic experience" and was talking to a police officer.

Whitlow asked youth if he was okay, and youth said that he was. Whitlow told youth that he "had been at fire scenes before and usually [he] would have expected somebody to still be there." Youth said that he ran all the way to J's house. Whitlow asked why he did not stay. Youth responded, "My life is worth more than theirs."

_____

[2] The witnesses gave differing testimony as to where exactly youth's mother was standing, and the juvenile court did not make any findings on that issue, but it is undisputed that mother was standing close enough to hear and was, at most, 15 to 20 feet away.

Whitlow then asked youth how he became aware of the fire. Youth said that he was awake and saw light under the bottom of his bedroom door, so he opened the door and saw the fire. He got dressed and exited through the window.

Noticing a small scab on youth's forehead, Whitlow asked what had caused it. Youth said that he burned himself while "smoking grass." Whitlow asked if he meant marijuana. Youth said he meant actual grass and pointed at the lawn. Whitlow replied that he "didn't hardly believe that because [he] never heard anything like that before." Youth pulled some grass from the lawn and said he rolled it up and smoked it. Whitlow asked how he lit it, and youth said with a magnifying glass. Whitlow told youth that it looked more like a cigarette burn to him.

Returning to the topic of the fire, Whitlow asked youth why he did not wake up his parents. Before youth could answer, youth's mother interjected, telling Whitlow that "that was enough conversation with him for now." Youths' mother interjected because she felt that Whitlow's voice was getting raised, and she told Whitlow that she felt that he was beginning to interrogate youth. Whitlow told her that what youth was saying did not make sense to him and that he was trying to get to the bottom of what happened. She responded that youth was scared and had been through a lot and that Whitlow could talk with him more later. Whitlow immediately ended the conversation, and youth went back into J's house. Nothing about youth's demeanor or responses had caused Whitlow to believe that youth had any comprehension deficits, and he perceived youth to have conducted himself in an age-appropriate manner. In total, the encounter between Whitlow and youth lasted "ten minutes at the most."

Before trial, youth moved to suppress his statements to Whitlow, arguing that the circumstances were compelling, such that Whitlow should have given him *Miranda* warnings before questioning him. The juvenile court held a suppression hearing, at which Whitlow and youth's mother testified to the historical facts already described. Youth also offered into evidence a report on a psychological evaluation of youth.

The report noted at the outset that the psychological evaluation was complicated by conflicting factual information and by youth's "unique history," which included "a strikingly unconventional childhood in which [youth] was largely isolated from peers and exposed to adults with oddly paranoid world views." Diagnosing him was therefore "exceedingly challenging." The report proceeded to describe youth as "an uncommonly intelligent child who learns quickly" but is "unusually underdeveloped with respect to his emotional and interpersonal maturation." He has "some unusual strengths (verbal comprehension, concrete reasoning, visual motor processing) and weakness [*sic*] (pattern recognition, visual-spatial processing)," such that he performs better than his peers on verbal tasks, and performs concrete functions better than average, but may have problems with abstract reasoning. Youth "processes information exceptionally quickly." He is "very unusual" interpersonally, however, and "presents and operates more like an 8-year-old than a 14-year-old, evidencing a naivete about how the world functions that is uncommon." At the same time, "[i]n many ways he appears strikingly normal and well adjusted, especially considering his unusual childhood." Ultimately, the evaluator diagnosed youth with autism spectrum disorder—a diagnosis that both youth and his mother "adamantly denied" (in the court's words)—as well as posttraumatic stress disorder, multiple phobias, and cannabis use disorder.

The juvenile court denied the motion to suppress. The court indicated that it was not a close case, stated that the core question was whether youth's circumstances while talking with Whitlow were "compelling and custody-like," and concluded that they were not. In reaching that conclusion, the court considered both the specific nature and circumstances of the conversation with Whitlow and youth's psychological evaluation. As to the latter, the court called attention to youth's intelligence and strong processing skills, while also recognizing that he is "unsophisticated," presents "more like an eight-year-old than a 14-year-old as far as naivete and how the world functions," and might be on the autism spectrum. The court observed that an autism diagnosis would not be dispositive, as "there are a lot of very

successful people that have autism spectrum disorder." The court also noted that youth "does not evidence any significant behavior problems, is in fact compliant, seemingly eager to form interpersonal connections with adults, an intelligent child, good vocabulary, learns quickly, responds well to warmth and positive regard, and he's done exceptionally well it says in detention." Ultimately, considering the totality of the circumstances, and taking into account youth's age and maturity, the court concluded that youth was not in compelling circumstances, so no *Miranda* warnings were required before Whitlow questioned him outside J's house.

The juvenile court proceeded to adjudicate youth. Youth appeals the resulting judgment, challenging the denial of his motion to suppress.

## ANALYSIS

Article I, section 12, of the Oregon Constitution provides that "[n]o person shall be * * * compelled in any criminal prosecution to testify against himself." To protect that right against compelled self-incrimination, the Supreme Court "has held that, before questioning, police must give *Miranda* warnings to a person who is in full custody or in circumstances that create a setting which judges would and officers should recognize to be compelling." *State v. Roble-Baker*, 340 Or 631, 638, 136 P3d 22 (2006) (internal quotation marks omitted); *see also State v. Moore/Coen*, 349 Or 371, 382, 245 P3d 101 (2010), *cert den*, 563 US 996 (2011) ("In Oregon, Article I, section 12, is an independent source for warnings similar to those required under the Fifth Amendment to the United States Constitution under *Miranda v. Arizona*, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966)."). "[I]f an officer fails to give the requisite *Miranda* warnings to a person who is in 'full custody' or in 'compelling' circumstances, we must suppress the statements made in direct response to unwarned questioning." *D. P.*, 259 Or App at 262 (some internal quotation marks omitted).

It is undisputed that youth was not in custody when he spoke to Whitlow at J's house. The issue is whether youth was nonetheless in compelling circumstances—*i.e.*,

circumstances that had the effect of "compelling" youth to testify against himself—such that Whitlow was required to give him *Miranda* warnings before asking him questions. Once youth moved to suppress, it was the state's burden to prove that the circumstances were not compelling. *Roble-Baker*, 340 Or at 639.

Deciding whether the circumstances were compelling requires considering the totality of the circumstances, which "includes both the setting of the questioning and the nature of the questions." *State v. Dunlap*, 215 Or App 46, 57, 168 P3d 295 (2007). Our "overarching inquiry is whether the officers created the sort of police-dominated atmosphere that *Miranda* warnings were intended to counteract." *Roble-Baker*, 340 Or at 641. We conduct that inquiry from the perspective of a reasonable person in youth's position. *Dunlap*, 215 Or App at 57 ("Compelling circumstances exist when, taking into account the totality of the circumstances, a reasonable person in the defendant's position would feel compelled to answer a police officer's questions."). Specifically, because youth is a child, we must determine "whether a reasonable person in child's position—that is, a child of similar age, knowledge and experience, placed in a similar environment—would have felt required to stay and answer all of [the officer's] questions." *State ex rel Juv. Dept. v. Loredo*, 125 Or App 390, 394, 865 P2d 1312 (1993). "An interview that would not be 'compelling' for an adult might nonetheless frighten a child into believing that he or she was required to answer an officer's questions." *Id*. at 395.

Circumstances relevant to the compelling-circumstances inquiry include the location of the encounter, its length, the amount of pressure exerted on the defendant (or youth), and the defendant's (or youth's) ability to terminate the encounter. *Roble-Baker*, 340 Or at 640-41. In keeping with the broad nature of the inquiry, those factors are non-exclusive, and they are not to be applied mechanically. *Id*. at 641.

Regarding the location of the encounter between youth and Whitlow, J's home was a familiar place where youth felt comfortable, as youth acknowledges. "[T]he fact that the interview occurs in familiar surroundings diminishes the

police-dominated atmosphere that *Miranda* warnings were intended to counteract." *State v. Shaff*, 343 Or 639, 646, 175 P3d 454 (2007). The interview also occurred in a place that was not physically restrictive—outside, in the yard. *Cf. D. P.*, 259 Or App at 262 (treating the fact that the 12-year-old youth was questioned in a school administrative office, with a closed door, and his back to the door, as adding to the compelling circumstances).

The presence of youth's mother also made the circumstances less compelling than if youth had been alone with Whitlow. *See id.* ("Youth did not have anyone familiar in the interview room within him, such as a parent, counselor, or teacher."). Youth's mother was not only present, but she remained within earshot for the entire conversation, was attentive to youth as he talked to Whitlow, and stopped the interview as soon as she felt that it began shifting toward interrogation.

In terms of the length of the encounter between youth and Whitlow, it was short, lasting no more than 10 minutes. When an encounter is short, the duration itself is unlikely to contribute to compelling circumstances—*see, e.g.*, *Shaff*, 343 Or at 642 (10-minute encounter); *Loredo*, 125 Or App at 392 (20-minute encounter)—although we note that the duration necessary to contribute to compelling circumstances may be less for a child than an adult. Here, the duration of the encounter weighs against compelling circumstances. That said, duration alone is almost never determinative, even for lengthy encounters. *See Roble-Baker*, 340 Or at 643-44 (treating duration of interview—"five or six hours"—as contributing to compelling circumstances, but not determinative); *State v. Grimm*, 290 Or App 173, 180, 414 P3d 435, *rev den*, 363 Or 283 (2018) (one and one-half hours "is not an insignificant amount of time to undergo questioning by police officers," but it is "not determinative of compelling circumstances"). Ultimately, "'any consideration of the durational factor is necessarily dependent on the character or quality of the interaction'; thus, 'the principle emphasis is properly on the qualitative dynamics addressed in the third and fourth of the *Roble-Baker* factors,'" *Grimm*, 290 Or App at 180 (quoting *State v. Northcutt*, 246 Or App 239, 250, 268

P3d 154 (2011)), *i.e.*, "(3) the amount of pressure exerted on the defendant; and (4) the defendant's ability to terminate the encounter," *id.* at 178 (quoting *Roble-Baker*, 340 Or at 640-41).

We therefore next consider the amount of pressure exerted on youth. "In considering the pressure on a suspect, the focus of our inquiry is on the use of aggressive and coercive police interrogation practices, especially including, but not limited to, those explicitly predicated on assumptions of a suspect's guilt or calculated to contradict a suspect's assertions of innocence." *State v. Mattheisen*, 273 Or App 641, 649, 359 P3d 1218 (2015) (internal quotation marks omitted); *see also Shaff*, 343 Or at 650 ("[W]hat matters is not whether evidence of guilt was apparent to the suspect; rather, it is whether the officers used that evidence in a coercive manner.").

In *State v. Machain*, 233 Or App 65, 75, 225 P3d 75 (2009), for example, the police exerted "significant" pressure on a 15-year-old girl during a murder investigation, where they told her that her account of events was inconsistent with another suspect's, told her that a polygrapher had been summoned because the district attorney knew she had lied, asked questions that assumed her guilt, suggested that they were receiving information during the interview and "either knew or would soon know 'everything,'" and asked "questions that delved into extremely personal, sensitive topics." Conversely, in *Shaff*, 343 Or at 646-47, the police did not exert significant pressure on the defendant by asking him twice in 10 minutes whether he had assaulted a woman, including once falsely implying that the woman had reported an assault.

Here, there is no evidence that Whitlow used "aggressive and coercive police interrogation practices" in talking with youth, including but not limited to asking questions that were predicated on an assumption of youth's guilt or that were calculated to contradict assertions of innocence. *Mattheisen*, 273 Or App at 649. Whitlow did not confront youth with any evidence that he was involved in the fire, ask any questions that assumed that youth started the fire, or contradict any assertions of innocence. Early in

the conversation, Whitlow asked a single question as to why youth had left the scene of the fire, referencing his own experience that people tend to stay at fire scenes. However, that does not amount even to signaling that youth was a suspect, let alone to confronting youth with evidence of guilt in an aggressive and coercive manner. The comment explained why Whitlow was asking the question. Whitlow also notably did not say that *innocent* people typically stay at fire scenes or that *guilty* people typically leave them. And nothing else about Whitlow's questioning was "aggressive and coercive," *id.*, so as to exert significant pressure on youth of a sort that would contribute to compelling circumstances. *Cf. D. P.*, 259 Or App at 264 (citing "the repetitive and escalating nature" of two detectives' questions to a 12-year-old boy over the course of an hour and forty minutes, "and the increasingly coercive tactics used by the detectives," as contributing to compelling circumstances).

As for youth's ability to terminate the encounter, another relevant consideration for compelling circumstances, Whitlow never told youth that he was required to stay or not free to leave. *See Roble-Baker*, 340 Or at 641 ("[T]his court has held that compelling circumstances exist when a police officer tells a defendant that he or she is not free to leave the police station and terminate the encounter."). On the other hand, Whitlow never explicitly told youth that he was free to leave either—although, he obviously was, in that the encounter ended as soon as youth's mother voiced a desire to terminate it. *See id.* ("[W]hen a police officer tells a defendant that he or she may terminate the encounter— and then allows that defendant to do so—the officer has not placed the defendant in compelling circumstances.").

Finally, youth points to the fact that Whitlow was in uniform and carrying a holstered firearm. However, the fact that an officer is in uniform and carrying a holstered firearm has generally not been treated as making circumstances compelling. More often, it is the absence of a uniform and visible weapon that is notable, as making circumstances less compelling. *See, e.g., D. P.*, 259 Or App at 262 ("[n]either detective wore a uniform or displayed his badge or firearm"); *Loredo*, 125 Or App at 392, 394 (the officer "was

dressed in plain clothes and his gun was hidden from view under his jacket"); *but see also State v. Prickett*, 324 Or 489, 495, 930 P2d 221 (1997) (suggesting that a "drawn gun" would have made the circumstances more compelling).

In sum, having considered all of the foregoing factors, we agree with the juvenile court that, under the totality of the circumstances, youth was not in compelling circumstances so as to require *Miranda* warnings before Whitlow questioned him outside J's house. It follows that the juvenile court did not err in denying the motion to suppress. In reaching that conclusion, we acknowledge that youth was 14 years old at the time of the encounter, was unusually naïve for his age, and had some social deficits. However, we disagree with youth that his age or psychological profile rendered these circumstances sufficiently compelling that youth was compelled to testify against himself, in violation of Article I, section 12. There is no question that the circumstances were more compelling for youth than for an average adult, or for some other youths, but they were not sufficiently compelling to require *Miranda* warnings. We emphasize that we reach that conclusion on the totality of the facts in this record and that any change in those facts—such as if youth had been alone with Whitlow, or if the encounter had taken place in a less familiar or more restrictive setting—would present a different case.

Affirmed.