Submitted March 23, affirmed June 1, petition for review denied
October 6, 2011 (351 Or 216)

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## JUAN LUIS NUNEZ,
*Defendant-Appellant.*

Jackson County Circuit Court
082614FE; A141814

259 P3d 941

Rankin Johnson IV filed the brief for appellant.

John R. Kroger, Attorney General, David B. Thompson, Interim Solicitor General, and Erin C. Lagesen, Assistant Attorney General, filed the brief for respondent.

Before Brewer, Chief Judge, and Edmonds, Senior Judge.

BREWER, C. J.

**BREWER, C. J.**

Defendant appeals from his convictions for one count of first-degree rape and two counts of first-degree burglary. Defendant asserts that the statements and DNA samples he gave to police officers after receiving *Miranda* warnings, as well as earlier statements that he had made to one of the officers, should have been suppressed because that officer had questioned him in compelling circumstances without first giving him *Miranda* warnings in violation of Article I, section 12, of the Oregon Constitution.[1] We affirm.

We state the following facts consistently with the trial court's factual findings and its decision to deny, in part, defendant's motion to suppress. *State v. Shaff*, 343 Or 639, 641, 175 P3d 454 (2007). Police officers were investigating a burglary at an apartment complex on Bolz Road. There had been reports of a prowler in the vicinity for several months, and some of the reports had identified the prowler as a Hispanic male, who was 5'5" to 5'8" in height. One report identified a possible suspect by the name of "Pallone." Defendant was known to local police by that name. B, a resident in the same apartment complex, reported having been raped by an intruder. The man spoke to her in English, but he had a "thick Hispanic accent."

Early one morning during the course of their investigation, police received a report that defendant was sitting in front of an apartment complex. Police Chief Bowker went to that location to speak with defendant. Bowker asked defendant if he had been near the Bolz Road apartment complex. Defendant replied that he had not been there. A van pulled up, and defendant asked Bowker if he could go to work. Bowker agreed to that request, and he asked defendant when he got off work. Defendant told Bowker that he would be dropped off at the same location after work that afternoon. Although the conversation occurred in English, Bowker had to speak slowly to ensure that defendant understood him.

Officer Price went to defendant's trailer later that day; defendant answered the door and invited Price inside.

---

[1] Article I, section 12, provides, in part, that "[n]o person shall * * * be compelled in any criminal prosecution to testify against himself."

Price turned on a tape recorder and sat across from defendant inside the trailer. The tone of the conversation was "casual." Defendant admitted to looking inside windows, and Price asked defendant to go with him to some of the possible locations and indicate whether he had looked inside windows there. Defendant agreed, and the men left the trailer. Defendant rode in the back seat of Price's police cruiser because the front seat was full of "stuff." Price took defendant to the apartment complex where the burglaries and rape had occurred. Defendant pointed out which windows that he had looked in, including one near the rape victim, B's, apartment. Price asked defendant about B's window, and defendant "made this motion several times—let's go, and he dives into the window motion." At that point, Price believed that defendant was indicating that he had entered the apartment through the window and that he had enough information to detain defendant. Price took defendant back to the patrol car and placed him in handcuffs. As they were leaving, B observed Price and defendant through her window. After Price handcuffed defendant, he returned to speak to B. B told Price that defendant looked like the rapist.

Price took defendant to the police station. During the three-block ride, Price did not question defendant. When they arrived at the station, they went to Price's office, where Price removed defendant's handcuffs and offered him a seat. Price then began questioning defendant. After talking to defendant for a brief period of time, during which defendant talked about taking off window screens and his uncle's drinking problem, Price realized that he had forgotten to read defendant the *Miranda* warnings. Price then read those warnings to defendant in English. Price believed that defendant understood because defendant nodded his head "yes" as Price read the rights. However, Price was concerned that defendant did not understand "every single—some of the big words that I use, or some of the sentence structures that I may have used. But rephrasing the question and whatnot— you know—I was comfortable that he understood." Price then continued to question defendant and, during that questioning, defendant admitted that he had raped B.

At some point during the questioning, Price became concerned that there might be "issues" with the interview,

because defendant's answers "were sometimes too short and you couldn't see the verbal or the physical responses" that defendant was giving. Price then stopped questioning defendant and transported him to a neighboring police department station, where he had arranged for Officer Rojas to question defendant in Spanish. Rojas was not wearing a police uniform. Price told Rojas that defendant had admitted to entering B's apartment and committing the rape. Rojas then interviewed defendant outside Price's presence. About 45 minutes had elapsed between Price's termination of his interview with defendant and the commencement of Rojas's interview.

At the outset of his interview, Rojas reviewed the *Miranda* warnings with defendant in Spanish, and defendant acknowledged that he understood each of his rights. Rojas then asked defendant if he knew why he was there; defendant responded "that he believed he was there because he got high, he got drunk, he went to look into windows, and then he laid on some lady's bed." As the interview progressed, defendant admitted raping B. At Rojas's request, defendant agreed to provide DNA samples, which matched evidence secured from the rape victim.

After he was indicted in this case, defendant moved to suppress evidence of the statements that he made to Price and Rojas and the DNA samples. The state conceded that the statements defendant made to Price at the police station before Price gave defendant *Miranda* warnings must be suppressed, but otherwise opposed the motion. The trial court determined that defendant was first in compelling circumstances when Price handcuffed him and placed him in the patrol car. Because Price questioned defendant thereafter without first administering *Miranda* warnings, the court suppressed the statements that defendant made after he was handcuffed and before Price administered the warnings. However, the court determined that defendant understood the warnings that Price gave him and concluded that defendant's post-*Miranda* statements, and the DNA samples, were not subject to suppression. The court further concluded that the statements that defendant made to Price before he was handcuffed were admissible.

Article I, section 12, of the Oregon Constitution, is an independent source for warnings similar to those required under the Fifth Amendment to the United States Constitution by *Miranda v. Arizona*, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966). *See State v. Magee*, 304 Or 261, 265-66, 744 P2d 250 (1987) (so stating). Under Article I, section 12, the police must give a defendant who is in custody *Miranda*-like warnings prior to questioning. *Id.* In addition, *Miranda*-like warnings also are required in circumstances that, although they do not rise to the level of full custody, nevertheless create a "setting which judges would and officers should recognize to be 'compelling.'" *State v. Smith*, 310 Or 1, 7, 791 P2d 836 (1990) (quoting *Magee*, 304 Or at 265).

When police officers obtain pretrial statements from a defendant in violation of Article I, section 12, such statements must be excluded at trial in order to restore the defendant to the position that he or she would have been in if police had not violated that constitutional right. *See State v. Simonsen*, 319 Or 510, 518-19, 878 P2d 409 (1994) (adopting rationale from *State v. Davis*, 313 Or 246, 834 P2d 1008 (1992)). In determining whether such a violation occurred, we are bound by the trial court's findings of fact if they are supported by evidence in the record. *State v. Pamperien*, 156 Or App 153, 155, 967 P2d 503 (1998). However, the ultimate determination as to whether a defendant was in compelling circumstances requiring *Miranda* warnings is a question of law. *State v. Stevens*, 311 Or 119, 135, 806 P2d 92 (1991).

Recently, in *State v. Vondehn*, 348 Or 462, 474, 236 P3d 691 (2010), the Supreme Court observed that

"Article I, section 12, affords a constitutional right to remain silent. That right is, however, subject to waiver. Because a custodial interrogation is inherently compelling, and to ensure the validity of a waiver of the right against self-incrimination, Article I, section 12, requires that the police inform a person subjected to custodial interrogation that he or she has a right to remain silent and to consult with counsel and that any statements that the person makes may be used against the person in a criminal prosecution. Article I, section 12, requires those *Miranda* warnings to ensure that a person's waiver is knowing as well as voluntary. If the police conduct a custodial interrogation

without first obtaining a knowing and voluntary waiver of the suspect's rights, then they violate the suspect's Article I, section 12, rights. To give effect to those constitutional rights, the state is precluded from using, in a criminal prosecution, statements made in response to the interrogation."

In this case, the trial court granted defendant's motion to suppress the statements that he made to Officer Price after defendant was handcuffed and placed in the patrol car but before Price administered *Miranda* warnings to him at the police station. However, the court concluded that defendant was not in compelling circumstances during any of his interactions with police officers before he was handcuffed. Accordingly, the court denied defendant's motion to suppress his statements to Price before he was handcuffed and, derivatively, his post-*Miranda* statements and the later-obtained DNA samples. Defendant assigns error to that ruling.

According to defendant:

"[Defendant] was under compelling circumstances when Sergeant Price came to his trailer to question him. At that point, the police had insisted that he be available for an interview. Officer Price had established that [defendant] had no American ID and that he had been in jail in California.

"In the alternative, he was under compelling circumstances when he left his trailer with Sergeant Price to show windows that he had been looking in. At that point, Sergeant Price directed his movements and was accusing him of committing crimes. Because [defendant] and Sergeant Price had difficulty speaking to each other in English, Sergeant Price's testimony is simply not sufficient to establish the crucial details about that interaction. Because [defendant] was under compelling circumstances, but did not receive *Miranda* warnings, the subsequently obtained evidence is not admissible."

Whether defendant was in compelling circumstances turns on "how a reasonable person in [his] position would have understood his * * * situation." *Shaff*, 343 Or at 645. That inquiry requires us to consider the totality of the circumstances, and the "overarching inquiry is whether the officers created the sort of police-dominated atmosphere that

*Miranda* warnings were intended to counteract." *State v. Roble-Baker*, 340 Or 631, 641, 136 P3d 22 (2006). The non-exclusive factors that we consider to make that determination include (1) the location of the encounter, (2) the length of the encounter, (3) the amount of pressure exerted on the defendant, and (4) the defendant's ability to terminate the encounter. *Id.* at 640-41. We also have looked at the number of officers and police cars at the scene, the demeanor of the investigating officer, and the use of physical force or confinement during questioning. *State v. Schwerbel*, 233 Or App 391, 395, 226 P3d 100, *rev den*, 349 Or 172 (2010) (citations omitted).

The Supreme Court's decision in *Shaff* is instructive here. In *Shaff*, officers received a report from a delivery person that a woman who answered the door at the defendant's trailer appeared to be injured. Two officers went to the trailer, knocked, and received no response, although they could hear movement inside the trailer. While the officers were talking to a neighbor, the defendant opened the door to the trailer and looked out. The officers returned to the trailer and explained to the defendant that they needed to make sure that the woman was safe. The officers entered the trailer and, while one officer searched for the woman, the other officer had the defendant take a seat on the couch, where they discussed "the incident." 343 Or at 641-42. The defendant acknowledged that he had argued with the woman. After about 10 minutes, the second officer took the woman outside to wait for a crisis counselor. The first officer told the defendant that the woman "obviously had been assaulted" and asked why she would have said she had been assaulted, after which the defendant admitted that he had hit the woman. At that point, the defendant was arrested and given *Miranda* warnings. *Id.* at 643.

In concluding that the defendant had not been in compelling circumstances before he was arrested and given *Miranda* warnings, the court reviewed the four factors from *Roble-Baker* described above. As for the location of the encounter, the court noted that it occurred in the defendant's own home, not a police station. "[T]he fact that the interview occurs in familiar surroundings diminishes the police-dominated atmosphere that *Miranda* warnings were

intended to counteract." *Id.* at 646. Regarding the second factor, the length of the encounter, the court noted that the length, approximately 10 minutes, was no greater than a normal traffic stop. *Id.* at 647. As to the third factor, concerning the amount of pressure exerted on the defendant, the court observed that the officer who questioned the defendant had only talked twice about the assault during the 10-minute interview, in contrast to *Roble-Baker*, which involved detention of a suspect "after questioning her for five to six hours at the police station and continu[ing] to confront her about questions that assumed her guilt." *Id.* at 647 (citing *Roble-Baker*, 340 Or at 643). The court concluded that, although the officer questioning the defendant "implied, inaccurately, that [the woman] had reported an assault," the circumstances were not sufficiently compelling to require *Miranda* warnings. *Shaff*, 343 Or at 647. In particular, the court distinguished between confronting a suspect with evidence of guilt, and the coercive use of such evidence: "[W]hat matters is not whether evidence of guilt was apparent to the suspect; rather, it is whether the officers used that evidence in a coercive manner." *Id.* at 650. Concerning the final factor, the defendant's ability to terminate the encounter, the court observed that the defendant was not physically restrained "in the ordinary sense," although he was not free to terminate the encounter. *Id.* at 647-48. *See also State v. Bush*, 203 Or App 605, 611, 126 P3d 705 (2006) (determining that lack of evidence of physical restraint of the defendant supported the conclusion that the circumstances were not compelling).

Here, the totality of the circumstances shows that defendant was not in compelling circumstances until Price handcuffed him and placed him in the patrol car at the Bolz Road apartment complex. Contrary to defendant's argument, the circumstances were not compelling when Price arrived at defendant's trailer. Bowker had allowed defendant to go to work that day after asking defendant if he could speak to him after work. When Price knocked on defendant's door, defendant opened it and invited Price to come in. Price was in uniform, but he did not threaten or coerce defendant with a show of force. He did not draw a weapon, and the lights and siren on his patrol car were turned off. There is no evidence that Price frisked or searched defendant. Price was the only officer

present, and the two men had a "casual" conversation while seated at defendant's table. Price recorded the conversation. During the conversation, Price did not accuse defendant of committing any crime. Although the recording demonstrates that defendant did not speak English fluently, the recording also supports the trial court's finding that defendant understood English. Defendant had lived in the United States for nine years, and it is apparent from the recording that he and Price were able to understand each other.

When Price asked defendant to accompany him to show Price the windows that defendant had looked into, Price did not indicate that defendant had to go with him. Price merely asked defendant to go with him, and defendant agreed. Defendant sat in the back seat of the patrol car without being handcuffed or otherwise restrained. Moreover, when they arrived at the Bolz Road apartment complex, Price did not restrain defendant or otherwise prevent him from walking around freely. Instead, Price followed defendant as defendant led him around the apartment complex. When defendant admitted looking into—and possibly entering into—the victim's window, Price did not immediately restrain him. Instead, defendant, not Price, said "let's go."

In sum, throughout the interaction between Price and defendant leading up to the point when Price handcuffed defendant and placed him in the patrol car, the totality of the circumstances demonstrated that defendant was not in compelling circumstances. First, the one-on-one encounter took place in defendant's trailer and at an apartment complex, not at a police station or other police-dominated location. Second, defendant does not assert that the length of the encounter was excessive. Third, although Price eventually asked defendant to accompany him and show him locations that might be crime scenes, Price did not unduly pressure or coerce defendant to do that or anything else. Fourth, even though Price did not tell defendant that he was free to go, there is no indication in the record that defendant would have been unable to terminate the encounter until he acknowledged what he had done outside the victim's apartment. Finally, defendant's lack of proficiency in English did not impair his ability to adequately communicate with Price so as to cause the circumstances of their interaction to be compelling. It follows that

the trial court did not err in declining to suppress the challenged statements and, derivatively, the DNA samples.[2]

Affirmed.

---

[2] Defendant does not advance a separate argument that the later *Miranda* warnings given by Price were ineffective to ensure that his decision to waive his right to remain silent was voluntary; rather, his only argument on appeal is that compelling circumstances without *Miranda* warnings require suppression of all the subsequently obtained evidence.