Argued and submitted May 29, reversed and remanded September 16, 2015

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

DUSTY WADE MATTHEISEN,
aka Dusty Wade Anderson,
*Defendant-Appellant.*

Jackson County Circuit Court
114897FE; A155079

359 P3d 1218

Neil F. Byl, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Robert M. Wilsey, Assistant Attorney General, argued the cause for respondent. On the brief were Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Peenesh H. Shah, Assistant Attorney General.

Before Ortega, Presiding Judge, and DeVore, Judge, and Garrett, Judge.

DEVORE, J.

**DEVORE, J.**

Defendant appeals a judgment of conviction for first-degree sexual abuse, ORS 163.427. He assigns error to the trial court's denial of his motion to suppress evidence of his inculpatory statements to police made in the absence of *Miranda* warnings. He argues that *Miranda* warnings were required because the circumstances of the interview were "compelling." Without such warnings, he contends, evidence of his statements violated his rights under Article I, section 12, of the Oregon Constitution.[1] We review whether the totality of circumstances was "compelling" for legal error. *State v. Northcutt*, 246 Or App 239, 245, 268 P3d 154 (2011). We reverse and remand.

"We state the facts consistently with the trial court's factual findings and its decision denying defendant's motion to suppress." *State v. Shaff*, 343 Or 639, 641, 175 P3d 454 (2007). In October 2011, Medford Detective Kirkpatrick spoke with M, a fourteen-year-old, about a report from the Department of Human Services about her fight with her mother. M mentioned that defendant, her stepfather, had sexually abused her "probably back in 2006." M told the detective that she awoke one night when defendant had his hand under her clothing. She said that he had touched her vagina and, within two minutes, left the room.

On October 14, 2011, Kirkpatrick conducted an initial interview with defendant at the police station for 45 minutes. The detective confronted defendant with M's allegation. Defendant was not given *Miranda* warnings. Defendant offered an innocent account of the event and denied having touched M's vagina. Kirkpatrick, however, stated multiple times during the interview that he believed that M was telling the truth about sexual abuse. To resolve the issue, Kirkpatrick offered to set up a polygraph test "with our polygrapher—not our polygrapher, but the guy

---

[1] Article I, section 12, provides, in part, that "[n]o person shall be *** compelled in any criminal prosecution to testify against himself." That constitutional provision "is an independent source for warnings similar to those required under the Fifth Amendment to the United States Constitution, as described in *Miranda v. Arizona*, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966)." *State v. Shaff*, 343 Or 639, 641 n 1, 175 P3d 454 (2007).

that we use * * *. He does work for the police department * * *." Defendant agreed to take the test.

The next day, defendant drove himself to the office of the private polygraph examiner. The examiner was Strickland, who had been a Medford police officer. Kirkpatrick drove separately, arriving in plain clothes with his gun, badge, police radio, and handcuffs. Strickland brought defendant into a testing office, and Kirkpatrick watched a video monitor in another room. Before beginning the test, Strickland told defendant that he was not in custody, that he was free to leave, and that everything in the testing office was being video recorded.

The preparation and examination lasted about two hours. The preparation included detailed questions about defendant's sexual history and use of pornography. After the polygraph test concluded, defendant waited about 10 minutes in the office reception area, while Strickland scored the test. Strickland told Kirkpatrick that defendant was "conclusively and clearly deceptive" as to the questions pertaining to the sexual abuse of M.

Strickland brought defendant back into the testing room along with Kirkpatrick for a final interview that was to last about 50 minutes and would culminate in defendant's admission to touching M's vagina. Like the day before, defendant was not advised of his *Miranda* rights. During the interviews, Strickland and Kirkpatrick did not raise their voice, threaten defendant, or apply any physical restraints.[2] And, defendant did not ask to leave.

Defendant sat on a couch, opposite to Strickland and Kirkpatrick, who sat side-by-side behind Strickland's desk. The door was closed for approximately half of the interview and thereafter remained partially open. Strickland began by explaining that he had scored the polygraph test and that defendant "clearly and conclusively [was] not telling the truth to the relevant questions" about M. Strickland said

---

[2] *See State v. Ford*, 244 Or App 289, 296, 260 P3d 637, *adh'd to as modified on recons*, 245 Or App 500, 263 P3d 1110 (2011) (concluding that "the officer's repeated commands to divulge more information, coupled with his implications of guilt, gave the encounter coercive overtones").

that there were "two groups of people[:] * * * the pedophiles, and * * * the opportunistic folks." He continued:

> "When I see reactions like this, it's one of two reasons: either the person is a fixated lover of children, and a pedophile, and have lots of victims, and lots of really terrible sexual acts to them, to children, or it's a person that's in the opportunity group, and it's not a normal pattern of behavior for them, and they have * * * a [conscience], and they are upset at themselves * * * so it's maybe [they] made a mistake in judgment due to stress, or alcohol, something like that, and it was a one-time event short lived."

Strickland emphasized that he hoped defendant was part of the latter group rather than "some deep dark sinister * * * person, who isolates and takes advantage of kids" as a pattern of behavior. Strickland told defendant that, "without any explanation from [defendant], we have to always assume the worst" but that he thought "this is just a spur of the moment mistake [defendant] made in judgment, it lasted briefly, just a one-time deal." Strickland posed a series of questions to defendant, seeking an admission as to which of two "groups"—pedophiles or opportunistic individuals—defendant belonged. Defendant replied, "No," after each question. When defendant denied sexually touching M, Strickland responded, "Wrong. You're not telling the truth to that."

Concurring with Strickland, Kirkpatrick opined that it was "obvious" to him that the sexual touching had occurred. He contended that "people" would want to know "why this happened" and that they would need an explanation. Kirkpatrick reiterated Strickland's theme that there are "two kinds of criminal offenders" and that he wanted to know why defendant had touched M. Kirkpatrick explained, again,

> "We know what happened. What we're trying to figure out was why. What people need to understand is why this happened, that it was a one-time occurrence, and that * * * it's not something that's gone on for years and years and years. * * * There's * * * a story behind this, and if it's a one-time mistake, people can understand that, but they can't understand saying deception [unintelligible] continue to lie

about—about what's going on * * * we need to get to the bottom of it."

Strickland added:

> "I mean, sometimes the person under-reports, so the fact is it happened 10 times, and there was intercourse, and oral sex, and all this terrible—I don't think that's the case here. I think you just made [a mistake], like I said, for whatever reason back then, it's a different time [unintelligible] five years before. You're a different guy. For whatever reason you made a mistake in judgment * * *."

Strickland, however, reasoned that, if the polygraph test had been contaminated by lying, he could not be sure that defendant was not a pedophile. At that point, defendant admitted that he looked underneath M's underwear, but he denied having touched her vagina.

Strickland suggested that defendant's failure to disclose looking under M's underwear could have contaminated the polygraph results. Using defendant's partial admission, Strickland said,

> "[I]f you're going to tell the truth, don't tell part of it, because then that's—that's called criminal thinking, and I don't want to think you're * * * a person that's a criminal, so if you're going to tell us the truth, tell us the whole truth. * * * If you truly do have a [conscience] then, you know, be honest. You know, just tell—tell us what it is. I'm thinking you * * * put your hand there, and touched, and then—and then you were done."

Taking the same tack, Kirkpatrick repeated that it was "very important" to discuss "the whole thing." Kirkpatrick emphasized that he, Strickland, and defendant "all know that * * * picking up her pajamas, and looking, and [leaving], is not the whole story[.]" Kirkpatrick said that "it doesn't work for us to tell half-truths[.]" He thought that defendant was trying to "minimize" the events, that defendant was not being forthcoming with the truth, and that an assertion that M had lied about being sexually abused did not "make any sense."

As the interview progressed, Kirkpatrick asked defendant whether he "felt coerced in any way like someone's made [him] say these things." Defendant responded that he

was "not sure." Kirkpatrick then asked whether any promises or threats had been made to him. Defendant responded, "I wouldn't say you made any promises or any threats * * *."

Strickland next suggested that defendant write an apology letter to M, so that M "understands that * * * [defendant is] not calling her a liar[.]" Defendant was noncommittal. After further prompting to tell "the whole truth," defendant admitted that he had touched M's vagina. Kirkpatrick again asked defendant whether he would be willing to write the apology letter to M. Defendant declined, explaining that he did not want to write the letter because "it kind of feels like * * * I'm writing down something, and putting my name to it to be used against me."

At the conclusion of the interview, Kirkpatrick asked defendant whether he had come to the testing office and took the polygraph test voluntarily and whether he had felt free to leave "this whole time." Defendant nodded in response to those questions. Immediately thereafter, Kirkpatrick arrested defendant in the testing office.

After defendant was charged with first-degree sexual abuse, he moved to suppress his statements during the final October 15 interview. He argued that he had not been advised of his *Miranda* rights, in violation of Article I, section 12. The state responded that no *Miranda* warning was required in this case because there were not compelling circumstances.

The trial court determined that the circumstances were not compelling. The court found that the testing office "looked very comfortable[,]" that "[n]o promises or threats were made[,]" and that the interview "was more of a question and answer, a free flowing conversation."[3] The court ruled,

---

[3] Although relevant as a matter of fact to the question of compelling circumstances, reference to promises or threats may be more commonly heard with regard to the separate legal issue concerning the voluntariness of a confession for the purposes of Article I, section 12, of the Oregon Constitution or the Fifth Amendment and the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *See, e.g., Schneckloth v. Bustamonte*, 412 US 218, 225-26, 93 S Ct 2041, 36 L Ed 2d 854 (1973); *State v. Acremant*, 338 Or 302, 324, 108 P3d 1139, *cert den*, 546 US 864 (2005); *State v. Smith*, 301 Or 681, 693, 725 P2d 894 (1986); *State v. Ruiz-Piza*, 262 Or App 563, 573, 325 P3d 802 (2014).

"[B]ased on all those statements [in the recorded interview], the location of the interview, the size of the room, the items in the room, the idea the defendant was not * * * prevented from leaving, there [were] no promises or coercion on behalf of the detectives, defendant drove himself there * * * based on all that, I find that under the totality of the circumstances, there was no coercion * * *."

Defendant entered a conditional plea agreement in which he pleaded no contest to first-degree sexual abuse, ORS 163.427.

The law that governs this appeal is familiar. "To protect a person's right against compelled self-incrimination under Article I, section 12, 'before questioning, police must give *Miranda* warnings to a person who is in full custody or in circumstances that create a setting which judges would and officers should recognize to be compelling.'" *State v. Ford*, 244 Or App 289, 294, 260 P3d 637, *adh'd to as modified on recons*, 245 Or App 500, 263 P3d 1110 (2011) (quoting *State v. Roble-Baker*, 340 Or 631, 638, 136 P3d 22 (2006)). "Whether compelling circumstances exist for purposes of Article I, section 12, necessarily depends on the particular circumstances of each case." *State v. Shirley*, 223 Or App 45, 49, 195 P3d 457 (2008).

In determining whether circumstances are compelling, we consider four, nonexclusive factors: "(1) the location of the encounter; (2) the length of the encounter; (3) the amount of pressure exerted on the defendant; and (4) the defendant's ability to terminate the encounter." *Roble-Baker*, 340 Or at 640-41 (internal citations omitted). Those factors are not exhaustive, "nor are they to be applied mechanically." *Id.* at 641. For instance, we have considered additional factors, including "the number of officers and police cars at the scene, the demeanor of the investigating officer, and the use of physical force or confinement during questioning." *State v. Nunez*, 243 Or App 246, 253, 259 P3d 941, *rev den*, 351 Or 216 (2011).

Considering the totality of the circumstances, we inquire "whether the officers created the sort of police-dominated atmosphere that *Miranda* warnings were intended to counteract." *Roble-Baker*, 340 Or at 641. We are mindful

that "whether the circumstances were compelling does not turn on either the officer's or the suspect's subjective belief or intent; rather, it turns on how a reasonable person in the suspect's position would have understood his or her situation." *Shaff*, 343 Or at 645. Ultimately, "what matters is not whether evidence of guilt was apparent to the suspect; rather, it is whether the officers used that evidence in a coercive manner." *Id*. at 650.

In this case, the first three of four factors suggest compelling circumstances, and they do so especially with regard to the third factor, upon which we will focus. The fourth factor favors the state, but it alone cannot be dispositive. We address each factor in turn.

As to the first factor, the location of the encounter, the state argues that the setting was "neutral" because (a) defendant drove himself to the office during an ordinary hour of the day, (b) the interview took place in "a typical private office," and (c) the office was "comfortable" and reasonably-sized. *See Northcutt*, 246 Or App at 249 (the defendant's motel suite was "neutral" as it was neither "familiar" to the defendant nor "akin to a police station or custodial facility"). The record supports the trial court's findings to the extent that the testing office was not part of a police station and to the extent that the testing office was comfortable in size and furnishings. Yet, even accepting those findings, those facts do not mean that this site was "neutral."

Defendant was not at home or seated in "a typical private office" that would be "familiar" to him. *Cf. Shaff*, 343 Or at 646 (explaining that the "fact that the interview occurs in familiar surroundings [such as the suspect's home] diminishes the police-dominated atmosphere"). Defendant was seated in an unfamiliar office while being subject to a polygraph examination and being video-recorded almost continuously for three hours. Although the office was not a police station, defendant knew that Strickland "does work for the police department" and was "the guy that [the police] use" for polygraph examinations. The location was integrally associated with police activity, and it carried the stress inherent in polygraph testing. This case contrasts with an

officer's "'casual' conversation" with a suspect while seated at a table in the suspect's own home or other familiar location. *Nunez*, 243 Or App at 255. Considering the polygraph testing equipment, the video recording, and the association between the location and former police activity, the circumstances that relate to the first factor support defendant's claim of compelling circumstances.

The second factor, the duration of the encounter, likewise favors defendant. This incriminating evidence was derived in the final 50-minute interview, but it was part of an experience, including a polygraph examination, that lasted nearly three hours, and was preceded by the initial interview on the day before. In itself, the duration of a police interview is rarely a dispositive factor. We have observed that this factor's role in the determination of compelling circumstances depends not on the quantity of time but rather on the quality of that time. *Northcutt*, 246 Or App at 250 (explaining that "any consideration of the durational factor is necessarily dependent on the character or quality of the interaction"). "Except in an otherwise close case in which duration may serve as a sort of tie-breaker, the principal emphasis is properly on the qualitative dynamics addressed in the third and fourth of the * * * factors." *Id.* Considering the pressured quality of the time, as explored in the next factor, we find that the duration of the encounter favors the view that circumstances were compelling.

As for the third factor, the amount of pressure exerted on a suspect, we conclude that this factor most strongly indicates compelling circumstances. In considering the pressure on a suspect, the focus of our inquiry is on "the use of aggressive and coercive police interrogation practices, especially including, but not limited to, those explicitly predicated on assumptions of a suspect's guilt or calculated to contradict a suspect's assertions of innocence." *Id.*

This inquiry is illustrated in another case. In *State v. Machain*, 233 Or App 65, 225 P3d 75 (2009), the defendant was interviewed at a sheriff's office for two and one-half hours, regarding a fatal shooting of her nephew and a theft from the safe in his home. Officers in that case interviewed the defendant three times within 24 hours and questioned

the defendant about "sensitive topics not directly related to the shooting," including the defendant's sexual activity. *Id.* at 69. They discussed sending the defendant for polygraph testing and ultimately told the defendant that "a polygrapher had been called in already" because they "knew" that she had lied. *Id.* at 75.

During the final interview, the officers were confrontational about inconsistencies in the defendant's explanations and "directed her to look at them" while she was talking about the shooting. The officers repeatedly stated that they would be able to find out what had actually happened and asked questions that implicitly assumed that the defendant was guilty. *Id.* An officer "announced that she might be about to receive more information from the crime lab," precipitating the defendant's admission that she had tried to break into the safe. *Id.* The defendant ultimately admitted that she was present when the victim was shot. *Id.* at 72.

Given the totality of the circumstances, we concluded that the circumstances were compelling. *Id.* at 76. In reaching this conclusion, we emphasized that unlike in cases in which

> "officers confronted the defendants with evidence of guilt briefly and noncoercively, the detectives here repeatedly told defendant that they would be able to disprove any falsehood, that they knew that she was lying, and that she needed to tell the truth and 'be honest now.' The detectives, who had told defendant that they would be able to figure out 'everything' and that 'we know what happened now,' repeatedly asked questions that assumed defendant's guilt."

*Id.* at 75-76. *But see Shaff,* 343 Or at 646-47 (circumstances not compelling where police detained the defendant for a brief period of time in his own home and the interview did not involve coercive interrogation); *State v. Saunders,* 221 Or App 116, 119-20, 188 P3d 449, *rev den,* 345 Or 416 (2008) (circumstances not compelling where the police interviewed the defendant in his own home and confronted him with incriminating evidence in a noncoercive manner).

In this case, the state argues that "the discussion was neither aggressive nor coercive." The state contends that the interview proceeded in a "fairly open-ended and, as the trial court found, 'free-flowing' manner." Although the detective and polygraph examiner expressed little doubt about their opinion, the state argues that they "had very little evidence of guilt"—just the polygraph test—and even that evidence "lost any ability to support defendant's guilt" when he admitted to lifting M's underwear without any touching. The civil nature of the interview supports the state's point, but the lack of useful evidence does not mean that the accusations of the examiner and detective were less convincing or put less pressure on defendant.

This case resembles *Machain*. Strickland and Kirkpatrick did much more than simply confront defendant with adverse evidence. From the beginning of the interviews, Strickland and Kirkpatrick confronted defendant with unqualified assertions of his guilt, despite his repeated denials of wrongdoing. Presenting an unwinnable dilemma, Strickland and Kirkpatrick persisted in telling defendant that he should identify himself as either a pedophile or an "opportunistic" individual. They said that they hoped he was just an "opportunistic" individual who had made a "one-time" error or "mistake in judgment," but they stressed that they would have to "assume the worst" in the absence of his confession. Throughout the interview, Kirkpatrick repeatedly leveraged the inadmissible polygraph results as dispositive evidence of defendant's guilt. The detective admonished defendant to tell him whether it was a "one-time occurrence" or "something that's gone on for years and years and years." By so doing, Kirkpatrick demonstrated a clear intent to build pressure on defendant to confess to the "less-serious" criminal behavior.

In light of the purported results of the polygraph, both Strickland and Kirkpatrick repeatedly insisted that they knew "what happened," that defendant was lying, and that defendant should "be honest" so that they could identify whether he posed a future threat. Their insistence reflected the use of repetitive and coercive police interrogation practices "explicitly predicated on assumptions of a suspect's guilt

[and] calculated to contradict a suspect's assertions of innocence." *Northcutt*, 246 Or App at 250. Although Strickland and Kirkpatrick maintained a professional demeanor, a pleasant and conversational tone of voice does not permit the type of coercive police practices that are impermissible in the absence of *Miranda* warnings. The third factor favors defendant.

As to the fourth factor, the suspect's ability to end the encounter, we conclude that this factor supports the state. Defendant disagrees that he could have left, because "a reasonable person in defendant's position would have understood [himself or] herself to be compelled to answer the detectives' questions during the interview." *Machain*, 233 Or App at 76. The state notes that defendant traveled voluntarily to Strickland's office in his own vehicle, the door to the testing room remained partially open during part of the interview, and Strickland had initially advised defendant that he was free to leave and was not in custody. Moreover, defendant agreed, in response to an inquiry just before his arrest, that he felt free to leave. Kirkpatrick's question came just before his arrest.

As to this factor, the trial court determined that defendant "was not prevented from leaving" and that defendant would have been able to end the interview. That was true until he acknowledged sexually abusing M. Because the record contains evidence sufficient for the trial court's findings on this factor, we agree with the state. *See Nunez*, 243 Or App at 255. Even so, this one of four factors does not overcome the otherwise compelling circumstances.[4]

In the totality of the circumstances, the exertion of this pressure on defendant through several interviews in unfamiliar surroundings with the seemingly objective confirmation of the polygraph comprises compelling circumstances. The detective and examiner "created the sort of police-dominated atmosphere that *Miranda* warnings

---

[4] Just before the final, full confession, one moment is noteworthy. When asked to write a letter of apology to M, defendant declined. His refusal demonstrated that he wanted to avoid providing evidence to incriminate himself, showed that he did not fully understand that he had already done so, and suggested that, from the outset, he had suffered from ignorance of his constitutional rights.

were intended to counteract." *Roble-Baker*, 340 Or at 641; *Machain*, 233 Or App at 76. The trial court erred in denying defendant's motion to suppress the challenged evidence from the final interview. Accordingly, we reverse and remand.

Reversed and remanded.