No. 656      September 18, 2024      59

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

HUNTER LEE JAMES ANDREWS,
*Defendant-Appellant.*

Washington County Circuit Court
20CR64945; A177140

Andrew Erwin, Judge.

Submitted August 10, 2023.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Emily P. Seltzer, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Philip Thoennes, Assistant Attorney General, filed the brief for respondent.

Before Shorr, Presiding Judge, Mooney, Judge, and Pagán, Judge.

SHORR, P. J.

Counts 2, 3, 4, 5, and 7 reversed and remanded; otherwise affirmed.

**SHORR, P. J.**

Defendant appeals from a judgment of conviction for four counts of first-degree sexual abuse, ORS 163.427. He raises three assignments of error. As to defendant's first assignment of error, we conclude that the trial court erred, in part, when it denied defendant's motion to suppress un-*Mirandized* statements that defendant made to a detective during a 92-minute interview at the police station. More specifically, we reject defendant's argument that the entirety of the interview was conducted under compelling circumstances and should have been suppressed. But we agree that the circumstances did become compelling before the end of the interview, when the repeated police interrogation tactics culminated in a direct accusation that defendant knowingly sexually abused a child. The court erred in not suppressing defendant's statements obtained after that point. Because we conclude that the trial court at least partially erred in denying the suppression motion, we do not need to reach defendant's remaining assignments of error, which challenge aspects of defendant's sentencing. As a result, we reverse and remand for further proceedings.

We state the facts consistently with the trial court's findings when they are supported by sufficient evidence in the record. *State v. Grimm*, 290 Or App 173, 174, 414 P3d 435, *rev den*, 363 Or 283 (2018). "[W]e presume that the trial court resolved disputed facts consistently with its express factual findings and its ruling denying defendant's motion to suppress." *Id.*

Tigard police detective Dresser began investigating a report by a 13-year-old girl, S, that she had been "inappropriately touched" by defendant. Defendant had dated S's mother and resided in the same apartment with both mother and S. Dresser had a couple of phone conversations with defendant and invited him to come to the police station to talk. Defendant came in on his own without a police escort. They met in an interview room that was essentially an office with a small table and two chairs. Dresser and defendant sat on opposite sides of the table. Defendant was not in handcuffs or any kind of restraint. The room had two doors, one to a secure holding area and one to a hallway that

led to other offices and an exit. Dresser was wearing "civilian clothes." Dresser did not inform defendant at any point during the interview of his rights under *Miranda v. State of Arizona*, 384 US 436, 469, 86 S Ct 1602, 16 L Ed 2d 694 (1966), which includes the right to remain silent, an explanation that his statements could and would be used against him in court, the right to consult with a lawyer and have a lawyer present, and the right to have a lawyer appointed before further questioning if defendant could not afford one.

At the beginning of the interview, Dresser indicated that the door behind him had been propped open, and he gave defendant specific directions to go down the hallway to exit the building if he had to leave. Dresser informed defendant that he was not under arrest and that "you are free to go any time, if you want. We're just simply here to talk about this issue." Defendant nodded, indicating that he understood, and stated that that was what he "thought was going to happen." Defendant appeared nervous at the outset and informed Dresser that he had ADHD and his "jitters get real bad."

Dresser asked for defendant's understanding "about this situation." Defendant then discussed three incidents when he was sleepwalking at night in his girlfriend's apartment. During those times, defendant explained that he had mistakenly walked into S's room and lay down with S instead of his girlfriend.[1] When he realized this, he would leave. Defendant also relayed that he understood that S had claimed that defendant once masturbated in front of her, which defendant denied and attributed to a misunderstanding when he was scratching his genitals.

During the interview, Dresser pressed defendant for further details regarding the sleepwalking incidents, including the initial incident in which defendant claimed to have fallen asleep on the toilet before sleepwalking into S's room by mistake. Defendant explained that he had cuddled up to S but woke up after about five minutes when he realized that she was not his girlfriend. Defendant volunteered that he engaged in no sexual contact with S. Defendant explained that he put a lock on his and his girlfriend's door after the first incident and later added a lock on the door of

---

[1] S shared the room with her brother and her grandmother.

the children's room after the third incident. Defendant had a hazier recollection of the second and third incidents but generally recalled waking up those times in the wrong room and leaving.

Dresser then asked defendant more specific questions about whether defendant touched S's skin or breasts. Defendant denied that he did but also explained that he could not say for sure and "that's the scariest part, because I don't know." Defendant denied that he ever told a Department of Human Services representative that he had touched S's vagina, but also later admitted that he had said that he did not do so "to [his] knowledge" because he did not know what he did when he was asleep. Dresser then focused on S's accusation that defendant had put his hand under her shirt and pants, touching her breasts and vagina, and S's belief that defendant had not been asleep.

Dresser asked defendant if he thought S was making the allegations up. Defendant responded that it was speculation, but

> "that's why my dad is freaking out, going 'You need to lawyer up. You need to get somebody in there by your side,' and I'm like 'Why? If he's just asking questions. I'm allowed to flee, whatever. There should be no reason for that. I haven't done anything wrong.' The only times you should lawyer up is when you've done something wrong. At least, that's my opinion of it. Like I haven't done anything wrong. I don't need one."

Defendant then explained that he loved his girlfriend, would not touch a child, and, when asked about S's motivations, explained that S may be lying because of defendant's issues with S's boyfriend and the fact that defendant took her phone away.

At that point, which was approximately halfway through the interview, Dresser asked defendant to confirm that he went into S's room at night to lie down with her, probed for further details about the three incidents, and questioned defendant's sleepwalking story because defendant did not have a diagnosis and could clearly recall some things that happened in each incident but not other details. Dresser asked what defendant would say to S if she were

there and inquired whether defendant thought that S was lying. Dresser observed that defendant had admitted to certain conduct consistent with S's allegations but not other conduct. Dresser also pressed defendant to admit that it was possible that what S alleged might be true. Defendant admitted that it was "potentially" true and a "possibility," but he also asserted that, in his heart, he knew he would not do this. Dresser again asked defendant what he would say to S if she were there and inquired whether he felt bad. Defendant responded that, if he did something, that was not his intention. Defendant was crying by that time, which occurred at several points in the interview, and stated that, if he did something, he felt horrible.

Dresser also pointed out that S's disclosures had been specific and remained consistent. Dresser continued to press defendant that S and defendant's stories were consistent, except for defendant's denial of any sexual contact. Defendant explained that he told S that "I don't feel I would have done this, *** [a]nd, if I did, I'm sorry." Dresser then asked defendant for further details on his recollection and his history of sleepwalking.

At that point in the interview, defendant received a call from his girlfriend and mentioned to her that he would call her back in a little bit. After the call, Dresser returned to questioning defendant about his history of sleepwalking. Defendant then referred to S's allegations, and the detective stated,"[w]ell, I think we've—I think, at least from my standpoint, it really happened." Defendant did not agree that it happened but then, as before, agreed to the "possibility, but I don't agree I did anything. Because I don't—I don't see myself doing that." Dresser then again asked for defendant's understanding regarding why S would have made up the allegations and further inquired about what defendant and S had discussed. Defendant stated that S did not like him and explained that he had told S, "If this—if these have happened, I'm sorry. I am not wanting you. I want your mother. I love your mother. I'm in love with your mother. I want to marry your mom."

After again pointing out inconsistencies in defendant's sleepwalking story, Dresser stated, "I'm being straight with you that—that you had some lapses in judgment and that you

did these things and that you knew you did them." Defendant replied that he did not believe S but was not dismissing her allegation either. Dresser returned to the allegations and suggested that defendant had had things happening in his life that may have caused him to "deviate from the norm," and he may now feel bad about what had happened. Defendant continued to acknowledge the "potential" that something had happened but was not "accepting or denying any of the allegations." Dresser also suggested that people "who will decide \*\*\* what happens next will look at this" and offered to defendant that he might "acknowledge what truthfully happened and admit here's a mistake." At that point, defendant stated that he knew "all the incidences were a mistake and they never should have happened," but then he proceeded to continue to maintain that he had been sleepwalking.

Dresser again returned to the details of each of the alleged incidents and cast doubt on defendant's claim to be sleepwalking. Dresser stated, "I don't think you're being a hundred percent truthful," suggested that defendant "may have made a mistake," and stated that "it's not fair to [S] for you not to step up and be completely honest, based on what she's had to do" and "live with." Right after that, the interview between Dresser and defendant concluded as follows:

"Defendant:    Okay, I'm done with this conversation.

"\*\*\*\*\*

"Detective:    She had to (inaudible)—

"Defendant:    I'm done. Done. I am done with my conversation.

"Detective:    —(inaudible) with CARES.

"Defendant:    I have said all I need to say. I've given my statement. And I agree that it's potential, but I don't know. So, I am not going to say anything further.

"Detective:    Okay

"Defendant:    Yeah. I'd like to leave, please.

"Detective:    You can leave. That was always the rules. Remember?

"Defendant:    I remember.

"Detective:   Okay."

The interview then concluded. Defendant was not arrested at that point and left the room. As noted, the total interview lasted for just over an hour and a half.

Defendant was ultimately charged with seven counts of sexual abuse in the first degree, ORS 163.427, and one count each of unlawful sexual penetration in the second degree, ORS 163.408; encouraging child sexual abuse in the second degree, ORS 163.686; and criminal mistreatment in the first degree, ORS 163.205. All of the charges related to defendant's conduct with S. Before trial, defendant moved to suppress, among other things, all statements that defendant made before being *Mirandized*, which necessarily covered Dresser's entire interview of defendant. The trial court denied the motion to suppress, concluding that, under the totality of the circumstances, defendant was neither in custody nor in compelling circumstances and that his participation had been voluntary, such that Dresser did not have to *Mirandize* defendant.

In support of its legal conclusions and the denial of the motion to suppress, the trial court made the following findings of fact:

- Defendant came to the interview voluntarily without a police escort.

- Dresser met defendant in a room at the police station, left the door propped open for defendant, informed defendant that he was free to go at any time, and gave defendant instructions on how to leave.

- Dresser informed defendant that he was not under arrest.

- Dresser was calm, conversational, never raised his voice, never made threats, promises, or offers of leniency, and made "no show of authority of any kind that appears on the video." Dresser was not coercive.

- Dresser was dressed in plain clothes with no visible weapon.[2]

_____

[2] The trial court made this finding based on its review of the video. From our review of the video in which Dresser quickly walks into the room and then immediately sits facing away from the camera, we also cannot see any visible weapon. On appeal, the state concedes that Dresser "almost certainly" would have been

- Defendant was very nervous and had ADHD. He was also emotional and crying at times. But there was no indication of a mental illness or that defendant had any misunderstanding about their communications. Defendant did not appear intoxicated.

- Defendant expressed that he did not have a problem having a conversation with the detective despite his father's advice not to participate and to get a lawyer.

- Defendant was not restrained and got up at times. He also took a phone call and told his girlfriend that he would call her back when he was done, indicating that defendant understood that he would not be in custody when the interview was done.

- At the conclusion of the interview, defendant acknowledged that he remembered that he was always free to terminate the interview and, at the moment he said he would like to leave, he was "allowed to terminate the interview and leave."

Soon after the denial of the motion to suppress, the court commenced a bench trial. At the conclusion of that trial, the court found defendant guilty of five counts of first-degree sexual abuse, merged the two guilty verdicts on Counts 2 and 3, which resulted in four convictions, and acquitted defendant on the remaining counts.

Defendant contends that the trial court erred in denying his motion to suppress the statements that he made during the interview with Dresser. We review a trial court's denial of a motion to suppress for legal error. *State v. Heise-Fay*, 274 Or App 196, 201, 360 P3d 615 (2015).

To protect the right against compelled self-incrimination under Article I, section 12, of the Oregon Constitution,[3] an officer must give *Miranda* warnings before questioning "a person who is in full custody or in circumstances that create a setting which judges would and officers should recognize to be compelling." *State v. Roble-Baker*, 340 Or 631, 638, 136 P3d 22 (2006) (internal quotation

---

wearing a service weapon that would have "likely" been visible to defendant. Either way, this fact ultimately had no meaningful effect on our analysis.

    [3] Article I, section 12, provides, in part, that "[n]o person shall be *** compelled in any criminal prosecution to testify against himself."

marks omitted). Once a defendant raises the issue, it is then "the state's burden to show that [the] defendant's unwarned statements were made before the circumstances became compelling." *Id.* at 639.

Defendant was not in custody when questioned by Dresser. The disputed issue is whether defendant was in compelling circumstances during the interview. "[W]hether the circumstances were compelling does not turn on either the officer's or the suspect's subjective belief or intent; rather, it turns on how a reasonable person in the suspect's position would have understood his or her situation." *State v. Shaff*, 343 Or 639, 645, 175 P3d 454 (2007). We consider the following non-exclusive factors in making that determination: (1) the location of the encounter, (2) the length of the encounter, (3) the amount of pressure exerted on the defendant, and (4) the defendant's ability to terminate the encounter. *Roble-Baker*, 340 Or at 640-41. We do not apply any of the factors mechanically, but we look at all of the circumstances and our "overarching inquiry is whether the officers created the sort of police-dominated atmosphere that *Miranda* warnings were intended to counteract." *Id.* at 641.

We turn to our application of the law. First, the location of the encounter was in a small office at a police station. Defendant appeared voluntarily at an agreed time, arrived without an escort, and was given specific instructions on how to leave the office through the propped-open door behind the detective. The sole detective was in plain clothes. Still, we consider the location of the site, a small office within the police station, to slightly favor defendant's position that this was a police-dominated atmosphere and to undermine the state's showing of an absence of compelling circumstances. We have observed that "the location of the encounter, the unfamiliar, police-station setting of the interview tended—necessarily—toward a police-dominated atmosphere." *Grimm*, 290 Or App at 180 (internal quotation marks omitted). However, we also then noted that a defendant who voluntarily comes to a station for an interview on his own power "lessened somewhat" the effect of the police-dominated interview location. *Id.*; *see also State v. Barber*, 179 Or App 674, 679, 41 P3d 455, *rev den*, 334 Or 632 (2002)

(no compelling circumstances where the defendant agreed to voluntarily come to the police station, made an appointment and arrived late, and never indicated that he wanted to leave).

We turn to the length of the encounter. The interview was just over one hour and a half. Again, *Grimm* is instructive. In *Grimm*, we concluded that an interview of similar time "would not, considered in isolation, compel a conclusion that the circumstances * * * were compelling." *Id.* at 180. After examining our case law, we noted that one hour and a half "is not an insignificant amount of time to undergo questioning by police officers; however, neither is it determinative of compelling circumstances." *Id.*; *see also State v. Northcutt*, 246 Or App 239, 250, 268 P3d 154 (2011) (holding that one hour and a half may be longer than many citizen-police encounters but was not determinative under *Roble-Baker*). "[A]s we explained in *Northcutt*, any consideration of the durational factor is necessarily dependent on the character or quality of the interaction." *Grimm*, 290 Or App at 180 (internal quotation marks omitted). The principal emphasis "is properly on the qualitative dynamics addressed in the third and fourth of the *Roble-Baker* factors." *Id.* (internal quotation marks omitted).

We, therefore, turn to an examination of the third and fourth *Roble-Baker* factors. Starting with the third factor, we readily conclude that the detective, through his questioning, exerted significant pressure on defendant. We fully credit, as we must, the trial court's factual findings, which are supported by the evidence. Dresser was, indeed, calm and conversational, and he never raised his voice or made threats or promises. His *tone and demeanor* were not coercive.

Dresser, however, returned repeatedly to S's allegations, frequently pressed defendant on details, cast substantial doubt on defendant's story while crediting S's accusations, called into question various inconsistencies with defendant's sleepwalking defense, used tactics to seek to get defendant to admit to a lapse in judgment and a "mistake," and pushed defendant to take personal responsibility for his conduct with a child in a manner that would effectively

serve as a confession. Taken together, those were coercive *practices* under our case law. *See Northcutt*, 246 Or App at 250 (stating that the "gravamen of the third *Roble-Baker* factor is the use of aggressive and coercive police interrogation practices, especially including, but not limited to, those explicitly predicated on assumptions of a suspect's guilt or calculated to contradict a suspect's assertions of innocence"); *State v. Mattheisen*, 273 Or App 641, 651-52, 359 P3d 1218 (2015) (police officers' professional demeanor and pleasant and conversational tone were overshadowed by repetitive and coercive interrogation practices that were predicated on assumptions of guilt, accusations of lying, confrontation with polygraph results, and use of pressure to attempt to get the defendant to admit to "less-serious" crimes); *State v. Ford*, 244 Or App 289, 296, 260 P3d 637, *adh'd to as modified on reasons*, 245 Or App 500, 263 P3d 1110 (2011) (An "officer's repeated commands to divulge more information"—occurring five or six times—coupled with the officer's implications of guilt gave the interview "coercive overtones."). The third factor heavily favors defendant.

We turn to the fourth factor, defendant's ability to terminate the encounter. From Dresser's perspective, he told defendant at the beginning that he was not under arrest and was "free to go anytime if you want." Dresser propped open the door behind him and gave defendant explicit instructions on how to leave the building. Further, at the conclusion of the interview when defendant asked to terminate the interview, Dresser honored that request immediately.

We also consider the circumstances that defendant was in and defendant's statements. Defendant confirmed at the beginning of the interview that he understood he was free to leave. He also confirmed at the end—right after he stated, "I'd like to leave, please"—that he remembered from the beginning that he was always free to leave. In the middle of the interview, he also indicated that his father had advised him against participating and, instead, advised him to obtain a lawyer. But defendant said that he did not want to do that and understood he could "flee." He also took a call from his girlfriend during the interview and indicated to her that he expected he would call her later after the conclusion

of the interview. In sum, at discrete points during the beginning, middle, and end of the interview, defendant made statements that demonstrated that he understood that he did not have to attend the interview and could terminate it at any time, which he did. The fourth factor heavily favors the state.

This is a difficult case where the key factors point in different directions. We also are mindful that we are not to apply those factors mechanically. Our "overarching inquiry is whether the officers created the sort of police-dominated atmosphere that *Miranda* warnings were intended to counteract." *Roble-Baker*, 340 Or at 641. We consider whether defendant was "in circumstances that create a setting which judges would and officers should recognize to be compelling." *Id.* at 638 (internal quotation marks omitted). We consider how "a reasonable person in the suspect's position would have understood his or her situation." *Shaff*, 343 Or at 645.

We are somewhat hampered by the fact that the parties initially take sweeping positions regarding the entirety of the interview. That is, defendant's primary argument on appeal is that the *entire* interview was conducted under compelling circumstances. The state argues in response that it was not compelling at any point. We reject both of those arguments. However, defendant contends in the alternative that the interview had at least become compelling towards the end of the interview by the point that Dresser asked defendant to "acknowledge what truthfully happened and admit here's a mistake." At that point, defendant expressly acknowledged that he knew that all the incidences were a mistake and they never should have happened.

We agree with defendant that, considering the totality of the circumstances leading up to that point, the interview had become coercive towards the end of the interview. We conclude that that point occurred when Dresser again returned to the allegations and made the unequivocal accusation, "I'm being straight with you, that—that you had some lapses in judgment and that you did these things and that you knew you did them." By that point, Dresser had repeatedly pressed defendant regarding S's allegations,

regularly pushed defendant regarding details and inconsistencies in his story, and made multiple attempts to get defendant to admit to criminal conduct through various interrogation tactics. Those tactics, when considered cumulatively, created compelling circumstances at the point that Dresser directly accused defendant of sexually abusing S and knowing that he had done so. That overbearing conduct ultimately created "the sort of police-dominated atmosphere that *Miranda* warnings were intended to counteract." *Roble-Baker*, 340 Or at 641.

We recognize that defendant's acknowledgement that he was free to leave at various points in the interview favors the state's position that the circumstances were not compelling. But an officer's coercive tactics that build throughout an interview to implore a defendant's admission to criminal conduct can undercut an officer's statement and a defendant's corresponding acknowledgement that the defendant was free to leave. Our decision in *Mattheisen* is particularly instructive. There, as here, the defendant had travelled to the police interview voluntarily, been advised at the outset that he was free to leave, was interviewed in a room with a partially propped-open door, and had expressly acknowledged to the interviewing officer (right before his arrest) that he had felt free to leave during the entire interview and was not in custody. *Mattheisen*, 273 Or App at 652. We concluded that "[e]ven so, this one of four factors does not overcome the otherwise compelling circumstances." *Id.* We reach the same conclusion here. We note that, although this is a close case, the state bears the burden of proving that the interview was not conducted under compelling circumstances.

In denying defendant's suppression motion, the trial court heavily relied on the following passage from *Roble-Baker*:

"Conversely, when a police officer tells a defendant that he or she may terminate the encounter—and then allows that defendant to do so—the officer has not placed the defendant in compelling circumstances. *See State v. Johnson*, 340 Or 319, 332, 131 P3d 173 (2006) (holding that defendant was not in compelling circumstances, in part, because 'when he asked the investigators to terminate the interview and return him to his home, they did so')."

340 Or at 641-42. Indeed, here, Dresser told defendant that he was free to leave and permitted defendant to terminate the interview. We acknowledge that that passage, standing alone, might suggest a rule. However, our reading of that passage in the overall context of *Roble-Baker*'s admonition to consider all of the relevant factors in a non-mechanical fashion under the totality of the circumstances suggests to us that *Roble-Baker* was not stating a bright-line rule as to that factor—the defendant's ability to terminate an encounter. Rather, the Supreme Court was pointing to one factor among several. Depending on the circumstances, an interview might become compelling following an officer's coercive questioning despite the officer initially offering and later allowing the defendant to terminate the interview. The protections of *Miranda* were intended to counteract the "current practice of incommunicado interrogation" and "dispel the compulsion inherent in custodial surroundings." *Miranda*, 384 US at 457-58.

We conclude that the trial court erred when it denied defendant's motion to suppress in its entirety. The court should have suppressed defendant's statements towards the end of the interview, starting right after Dresser unequivocally stated that defendant "did these things and that you know you did them" and continuing to the end of the interview.

We further conclude that the failure to suppress that evidence was not harmless. That is, we cannot say that the error had little likelihood of affecting the verdict. *See Grimm*, 290 Or App at 186 (explaining that we may affirm despite error only when the error had little likelihood of affecting the verdict). The disputed evidence was admitted at trial. The state used defendant's interview to corroborate S's accusations. Defendant made statements early in the interview, *before* the interview became compelling, that certainly were incriminating. For instance, he admitted to at least the potential and "possibility" that S's allegations were true and that he felt horrible and sorry if it had happened. Further, his sleepwalking defense was not compelling. However, when conducting the harmless-error analysis, we are not to usurp the role of the factfinder or reweigh the

evidence. *State v. Zaldana-Mendoza*, 299 Or App 590, 613, 450 P3d 983 (2019). Defendant's later statement, *after* the interview became compelling, that he knew that "all of the incidences were a mistake and they never should have happened" was significant evidence against him.

In sum, we conclude that the trial court erred, in part, when it failed to suppress the end of Dresser's interview of defendant. That error was not harmless. As a result, we do not reach defendant's assignments of error that challenge aspects of his sentencing. We reverse and remand the first-degree sexual abuse counts on which defendant was found guilty. We otherwise affirm those counts on which defendant was acquitted.

Counts 2, 3, 4, 5, and 7 reversed and remanded; otherwise affirmed.